# EXHIBIT A

CT Corporation

# Service of Process Transmittal

11/30/2018
CT Log Number 534496920

**TO:** Chris Dzbanski
Ford Motor Company
1 American Rd Whq 421-E6
Dearborn, MI 48126-2701

**RE:** **Process Served in California**

**FOR:** Ford Motor Company (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Jacques Powers, etc., et al., Pltfs. vs. Ford Motor Company, etc., et al., Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, cover Sheet, Instructions, Declaration(s), Complaint, Attachment(s) |
| **COURT/AGENCY:** | San Bernardino County - Superior Court - San Bernardino, CA<br>Case # CIVDS1830756 |
| **NATURE OF ACTION:** | Product Liability Litigation - Lemon Law - 2006 Ford F-350 Super Duty - VIN-1FTWW31P36EB31215 |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 11/30/2018 at 15:45 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after receipt |
| **ATTORNEY(S) / SENDER(S):** | Steve Mikhov<br>Knight Law Group, LLP<br>10250 Constellation Blvd, Suite 2500<br>Los Angeles, CA 90067<br>310-552-2250 |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 12/01/2018, Expected Purge Date: 12/06/2018<br><br>Image SOP<br><br>Email Notification, Chris Dzbanski cdzbansk@ford.com<br><br>Email Notification, Mary Ann MacKinnon mmackin1@ford.com |
| **SIGNED:** | C T Corporation System |
| **ADDRESS:** | 818 West Seventh Street<br>Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

11-30-18 @ 1245

# COPY

## SUMMONS
### (CITACION JUDICIAL)

## BY FAX

SUM-100

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

**F I L E D**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

NOV 27 2018

BY _Leanne M Landeros_
LEANNE M. LANDEROS, DEPUTY

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
FORD MOTOR COMPANY, a Delaware Corporation; SUNRISE
FORD, a California Corporation; and DOES 1 through 10, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JACQUES POWERS on behalf of BIG ISLAND CLIMBERS ON THE
MAINLAND, INC., and ANGEL POWERS on behalf of BIG ISLAND CLIMBERS
ON THE MAINLAND, INC.

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):*<br>San Bernardino County Superior Court<br>247 W. Third St.<br>San Bernardino, CA 92415 | **CASE NUMBER:** *(Número del Caso):*<br>CIVDS1830756 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Knight Law Group
10250 Constellation Blvd., Suite 2500, Los Angeles, CA 90067
(310) 552-2250

DATE: NOV 27 2018       Clerk, by LEANNE M. LANDEROS, Deputy
*(Fecha)*                *(Secretario)*                              *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* **FORD MOTOR COMPANY, a Delaware Corporation**

   under: ☒ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☒ by personal delivery on *(date):* 11-30-18

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
American LegalNet, Inc.
www.FormsWorkflow.com

# COPY

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Steve Mikhov (SBN 224676)/Amy Morse (SBN 290502)<br>Knight Law Group, LLP<br>10250 Constellation Blvd., Suite 2500, Los Angeles, CA 90067<br>TELEPHONE NO.: (310) 552-2250    FAX NO.: (310) 552-7973<br>ATTORNEY FOR (Name): JACQUES POWERS on behalf of BIG ISLAND CLIMBERS, et al. | **FILED**<br>SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF SAN BERNARDINO<br>SAN BERNARDINO DISTRICT<br><br>NOV 27 2018<br><br>BY _Leanne M Landeros_<br>LEANNE M. LANDEROS, DEPUTY |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF: San Bernardino
STREET ADDRESS: 247 W. Third St.
MAILING ADDRESS: 247 W. Third St.
CITY AND ZIP CODE: San Bernardino, CA 92415
BRANCH NAME: San Bernardino District Civil Division

CASE NAME: JACQUES POWERS on behalf of BIG ISLAND CLIMBERS and
ANGEL POWERS on behalf of BIG ISLAND CLIMBERS ON THE MAINLAND, INC. v. FORD MOTOR COMPANY, a Delaware Corporation

| CIVIL CASE COVER SHEET | | Complex Case Designation | CASE NUMBER: |
|---|---|---|---|
| [X] Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | [ ] Limited<br>(Amount<br>demanded is<br>$25,000 or less) | [ ] Counter  [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402). | **CIVDS1830756**<br>JUDGE:<br>DEPT: |

**Items 1–6 below must be completed (see instructions on page 2).**

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Asbestos (04)
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [ ] Business tort/unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [X] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re: arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403).**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint (not specified above) (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition (not specified above) (43)

2. This case [ ] is [X] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties.
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. [X] monetary    b. [X] nonmonetary; declaratory or injunctive relief    c. [X] punitive
4. Number of causes of action (specify): 6
5. This case [ ] is [X] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: 11/26/18

Amy Morse
(TYPE OR PRINT NAME)                                    (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

## NOTICE
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

CIVIL CASE COVER SHEET

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

**BY FAX**

CM-010

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the primary cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*
**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
Asbestos Property Damage
Asbestos Personal Injury/
Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
Medical Malpractice–
Physicians & Surgeons
Other Professional Health Care
Malpractice
Other PI/PD/WD (23)
Premises Liability (e.g., slip and fall)
Intentional Bodily Injury/PD/WD
(e.g., assault, vandalism)
Intentional Infliction of
Emotional Distress
Negligent Infliction of
Emotional Distress
Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel)
(13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
Legal Malpractice
Other Professional Malpractice
*(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
Breach of Rental/Lease
Contract *(not unlawful detainer or wrongful eviction)*
Contract/Warranty Breach–Seller
Plaintiff *(not fraud or negligence)*
Negligent Breach of Contract/
Warranty
Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
Collection Case–Seller Plaintiff
Other Promissory Note/Collections
Case
Insurance Coverage *(not provisionally complex)* (18)
Auto Subrogation
Other Coverage
Other Contract (37)
Contractual Fraud
Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
Writ of Possession of Real Property
Mortgage Foreclosure
Quiet Title
Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
Writ–Administrative Mandamus
Writ–Mandamus on Limited Court
Case Matter
Writ–Other Limited Court Case
Review
Other Judicial Review (39)
Review of Health Officer Order
Notice of Appeal–Labor
Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
*(arising from provisionally complex case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
Abstract of Judgment (Out of
County)
Confession of Judgment *(non-domestic relations)*
Sister State Judgment
Administrative Agency Award
*(not unpaid taxes)*
Petition/Certification of Entry of
Judgment on Unpaid Taxes
Other Enforcement of Judgment
Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
Declaratory Relief Only
Injunctive Relief Only *(non-harassment)*
Mechanics Lien
Other Commercial Complaint
Case *(non-tort/non-complex)*
Other Civil Complaint
*(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
Governance (21)
Other Petition *(not specified above)* (43)
Civil Harassment
Workplace Violence
Elder/Dependent Adult
Abuse
Election Contest
Petition for Name Change
Petition for Relief From Late
Claim
Other Civil Petition

**CIVIL CASE COVER SHEET**

# COPY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN BERNARDINO     CIVDS1830756

JACQUES POWERS, et al.                                    Case No. _____

                          vs.

                                                          CERTIFICATE OF ASSIGNMENT

FORD MOTOR COMPANY

A civil action or proceeding presented for filing must be accompanied by this certificate. If the ground is the residence of a party, name and residence shall be stated.

The undersigned declares that the above-entitled matter is filed for proceedings in the   San Bernardino
District of the Superior Court under Rule 404 of this court for the checked reason:

[X] General        [ ] Collection

| | Nature of Action | Ground |
|---|---|---|
| [ ] 1. | Adoption | Petitioner resides within the district. |
| [ ] 2. | Conservator | Petitioner or conservatee resides within the district. |
| [X] 3. | Contract | Performance in the district is expressly provided for. |
| [ ] 4. | Equity | The cause of action arose within the district. |
| [ ] 5. | Eminent Domain | The property is located within the district. |
| [ ] 6. | Family Law | Plaintiff, defendant, petitioner or respondent resides within the district. |
| [ ] 7. | Guardianship | Petitioner or ward resides within the district or has property within the district. |
| [ ] 8. | Harassment | Plaintiff, defendant, petitioner or respondent resides within the district. |
| [ ] 9. | Mandate | The defendant functions wholly within the district. |
| [ ] 10. | Name Change | The petitioner resides within the district. |
| [ ] 11. | Personal Injury | The injury occurred within the district. |
| [ ] 12. | Personal Property | The property is located within the district. |
| [ ] 13. | Probate | Decedent resided or resides within the district or had property within the district. |
| [ ] 14. | Prohibition | The defendant functions wholly within the district. |
| [ ] 15. | Review | The defendant functions wholly within the district. |
| [ ] 16. | Title to Real Property | The property is located within the district. |
| [ ] 17. | Transferred Action | The lower court is located within the district. |
| [ ] 18. | Unlawful Detainer | The property is located within the district. |
| [ ] 19. | Domestic Violence | The petitioner, defendant, plaintiff or respondent resides within the district. |
| [ ] 20. | Other | |
| [ ] 21. | THIS FILING WOULD NORMALLY FALL WITHIN JURISDICTION OF SUPERIOR COURT. | |

The address of the accident, performance, party, detention, place of business, or other factor which qualifies this case for filing in the above-designated district is:

Sunrise Ford                                    16005 Valley Blvd.
(NAME - INDICATE TITLE OR OTHER QUALIFYING FACTOR)        ADDRESS

Fontana                          CA                    92335
(CITY)                         (STATE)                 (ZIP CODE)

I declare, under penalty of perjury, that the foregoing is true and correct and that this declaration was executed on

11/26/18                    at   Los Angeles                        , California

                                 _____
                                 (Signature of Attorney/Party)

13-16503-360 Rev. 10/94                                              SB-16503

BY FAX

# COPY

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT
NOV 27 2018
BY Leanne M Landeros
LEANNE M. LANDEROS, DEPUTY

1  KNIGHT LAW GROUP, LLP
2  Steve Mikhov (SBN 224676)
   stevem@knightlaw.com
3  Amy Morse (SBN 290502)
   amym@knightlaw.com
4  10250 Constellation Blvd., Suite 2500
5  Los Angeles, CA 90067
   Telephone: (310) 552-2250
6  Fax: (310) 552-7973

7  Attorneys for Plaintiffs,
8  JACQUES POWERS on behalf of
   BIG ISLAND CLIMBERS ON THE MAINLAND INC. and
9  ANGEL POWERS on behalf of
   BIG ISLAND CLIMBERS ON THE MAINLAND INC.

10

11                    SUPERIOR COURT OF CALIFORNIA

12                    COUNTY OF SAN BERNARDINO

13                                        CIVDS1830756

14

15  JACQUES POWERS on behalf of        Case No.:
    BIG ISLAND CLIMBERS ON THE         Unlimited Jurisdiction
16  MAINLAND INC. and
    JANICE MCMILLAN on behalf of
17  BIG ISLAND CLIMBERS ON MAINLAND    VENUE DECLARATION FOR
    INC.,                              CONSUMERS LEGAL REMEDIES
18                                     ACT CLAIM
19           Plaintiffs,
                                       Assigned For All Purposes To
20        vs.                          Hon: _____

21                                     Dept.:
22  FORD MOTOR COMPANY, a Delaware
    Corporation.
23

24           Defendant.

25

26

27

28

-1-

Venue Declaration for Consumers Legal Remedies Act

BY FAX

I, Jacques Powers on behalf of Big Island Climbers on the Mainland Inc., declare as follows:

1. I am the Plaintiff in this action and make this declaration to the best of my knowledge, information and belief of the facts stated herein.

2. I purchased a used 2006 Ford F-350, VIN: VIN # 1FTWW31P36EB31215 ("Vehicle"), from Sunrise Ford, which is in the City of Fontana, County of San Bernardino, State of California.

3. The Complaint that will be filed in this matter contains a cause of action for violation of the Consumers Legal Remedies Act.

4. Defendant FORD MOTOR COMPANY is and was a Delaware Corporation registered to do business in the State of California, and at all times relevant hereto was engaged in conducting business in Los Angeles County with its agent for service in process in Los Angeles.

5. The acts, practices, policies, and procedures which form the basis of this action, or a substantial portion thereof, occurred in Placer County, and at the location of Defendant FORD MOTOR COMPANY's principle place of business in the City of Fontana, County of San Bernardino, State of California.

6. In compliance with Civil Code, section 1780, subdivision (c), this cause of action has been properly commenced in the proper county or judicial district for trial.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and was executed by me in Lake Arrowhead, California, on 11/7/2018

_Jacques Powers_

Jacques Powers on behalf of
Big Island Climbers on the Mainland Inc.

-2-
Venue Declaration for Consumers Legal Remedies Act

# COPY

KNIGHT LAW GROUP, LLP
Steve Mikhov (SBN 224676)
stevem@knightlaw.com
Amy Morse (SBN 290502)
amym@knightlaw.com
10250 Constellation Blvd., Suite 2500
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

Attorneys for Plaintiffs,
JACQUES POWERS on behalf of
BIG ISLAND CLIMBERS ON THE MAINLAND INC. and
ANGEL POWERS on behalf of
BIG ISLAND CLIMBERS ON THE MAINLAND INC.

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

NOV 27 2018

BY _____
LEANNE M. LANDEROS, DEPUTY

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN BERNARDINO**

BY FAX

| | |
|---|---|
| JACQUES POWERS on behalf of **BIG ISLAND CLIMBERS ON THE MAINLAND INC.** and JANICE MCMILLAN on behalf of **BIG ISLAND CLIMBERS ON MAINLAND INC.**, <br><br> Plaintiffs, <br><br> vs. <br><br> FORD MOTOR COMPANY, a Delaware Corporation. <br><br> Defendant. | Case No.: CIVDS1830756 <br> Unlimited Jurisdiction <br><br> **VENUE DECLARATION FOR CONSUMERS LEGAL REMEDIES ACT CLAIM** <br><br> *Assigned For All Purposes To* <br> *Hon:* _____ <br><br> Dept.: |

-1-

Venue Declaration for Consumers Legal Remedies Act

I, Angel Powers on behalf of Big Island Climbers on the Mainland Inc., declare as follows:

1.  I am the Plaintiff in this action and make this declaration to the best of my knowledge, information and belief of the facts stated herein.

2.  I purchased a used 2006 Ford F-350, VIN: VIN # 1FTWW31P36EB31215 ("Vehicle"), from Sunrise Ford, which is in the City of Fontana, County of San Bernardino, State of California.

3.  The Complaint that will be filed in this matter contains a cause of action for violation of the Consumers Legal Remedies Act.

4.  Defendant FORD MOTOR COMPANY is and was a Delaware Corporation registered to do business in the State of California, and at all times relevant hereto was engaged in conducting business in Los Angeles County with its agent for service in process in Los Angeles.

5.  The acts, practices, policies, and procedures which form the basis of this action, or a substantial portion thereof, occurred in Placer County, and at the location of Defendant FORD MOTOR COMPANY's principle place of business in the City of Fontana, County of San Bernardino, State of California.

6.  In compliance with Civil Code, section 1780, subdivision (c), this cause of action has been properly commenced in the proper county or judicial district for trial.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and was executed by me in Lake Arrowhead, California, on 11/7/2018

*Angel Powers*
_____
Angel Powers on behalf of
Big Island Climbers on the Mainland Inc.

-2-

Venue Declaration for Consumers Legal Remedies Act

COPY

KNIGHT LAW GROUP, LLP
Steve Mikhov (SBN 224676)
stevem@knightlaw.com
Amy Morse (SBN 290502)
amym@knightlaw.com
10250 Constellation Blvd., Suite 2500
Los Angeles, CA 90067
Telephone: (310) 552-2250
Fax: (310) 552-7973

Attorneys for Plaintiffs,
JACQUES POWERS on behalf of
BIG ISLAND CLIMBERS ON THE MAINLAND, INC., and
ANGEL POWERS on behalf of
BIG ISLAND CLIMBERS ON THE MAINLAND, INC.



## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN BERNARDINO

| | |
|---|---|
| JACQUES POWERS on behalf of BIG ISLAND CLIMBERS ON THE MAINLAND, INC., and ANGEL POWERS on behalf of BIG ISLAND CLIMBERS ON THE MAINLAND, INC. | Case No.: CIVDS1830756 |
| | Unlimited Jurisdiction |
| | **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | *Assigned for All Purposes to the Honorable* |
| vs. | |
| | Department |
| FORD MOTOR COMPANY, a Delaware Corporation; SUNRISE FORD, a California Corporation; and DOES 1 through 10, inclusive, | |
| Defendant. | |

BY FAX

-1-

DEMAND FOR JURY TRIAL

## DEMAND FOR JURY TRIAL

_Plaintiffs, JACQUES POWERS on behalf of BIG ISLAND CLIMBERS and ANGEL POWERS on behalf of BIG ISLAND CLIMBERS ON THE MAINLAND, INC., hereby demand trial by jury in this action.

Dated: _11/26/18_

KNIGHT LAW GROUP, LLP

Steve Mikhov (SBN 224676)
Amy Morse (SBN 290502)
Attorneys for Plaintiffs,
JACQUES POWERS on behalf of
BIG ISLAND CLIMBERS ON THE
MAINLAND, INC. and
ANGEL POWERS on behalf of
BIG ISLAND CLIMBERS ON THE
MAINLAND, INC.

-2-

**DEMAND FOR JURY TRIAL**

# COPY

**KNIGHT LAW GROUP, LLP**
Steve Mikhov (SBN 224676)
stevem@knightlaw.com
Amy Morse (SBN 290502)
amym@knightlaw.com
10250 Constellation Blvd, Suite 2500
Los Angeles, CA 90067
Tel.:   (310) 552-2250
Fax:   (310) 552-7973

Attorneys for Plaintiff,
JACQUES POWERS on behalf of
BIG ISLAND CLIMBERS ON THE MAINLAND, INC., and
ANGEL POWERS on behalf of
BIG ISLAND CLIMBERS ON THE MAINLAND, INC.

*FILED*
*SUPERIOR COURT OF CALIFORNIA*
*COUNTY OF CALIFORNIA*
*SAN BERNARDINO DISTRICT*

NOV 27 2018

BY _Leanne M Landeros_
LEANNE M. LANDEROS, DEPUTY

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SAN BERNARDINO

| | |
|---|---|
| JACQUES POWERS on behalf of **BIG ISLAND CLIMBERS ON THE MAINLAND, INC.,** and **ANGEL POWERS on behalf of BIG ISLAND CLIMBERS ON THE MAINLAND, INC.** <br><br> Plaintiff, <br><br> vs. <br><br> **FORD MOTOR COMPANY, a Delaware Corporation; SUNRISE FORD, a California Corporation; and DOES 1 through 10, inclusive,** <br><br> Defendants. | Case No.:   **CIVDS1830756** <br><br> Unlimited Jurisdiction <br><br> **COMPLAINT** <br><br> 1. **FRAUD IN THE INDUCEMENT - INTENTIONAL MISREPRESENTATION** <br> 2. **NEGLIGENT MISREPRESENTATION** <br> 3. **FRAUD IN THE INDUCEMENT - CONCEALMENT** <br> 4. **FRAUD IN PERFORMANCE OF CONTRACT – INTENTIONAL MISREPRENTATION** <br> 5. **VIOLATION OF THE SONG-BEVERLY ACT** <br> 6. **VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT** <br><br> *Assigned for All Purposes to the Honorable* <br><br> Department |

BY FAX

-1-

Plaintiffs, JACQUES POWERS on behalf of BIG ISLAND CLIMBERS and ANGEL POWERS on behalf of BIG ISLAND CLIMBERS ON THE MAINLAND, INC., allege as follows against Defendants FORD MOTOR COMPANY, a Delaware Corporation ("FORD"), SUNRISE FORD, a California Corporation ("SUNRISE FORD"), and DOES 1 through 10 inclusive, on information and belief, formed after an inquiry reasonable under the circumstances:

**DEMAND FOR JURY TRIAL**

1.   Plaintiffs JACQUES POWERS on behalf of BIG ISLAND CLIMBERS and ANGEL POWERS on behalf of BIG ISLAND CLIMBERS ON THE MAINLAND, INC., hereby demand trial by jury in this action.

**GENERAL ALLEGATIONS**

2.   This lawsuit arises out of the defective 6.0-liter diesel engine installed in Ford-brand "Super Duty" trucks, including a truck purchased by Plaintiffs from SUNRISE FORD and for which FORD issued a written warranty. Plaintiffs assert causes of action against both FORD and SUNRISE FORD for fraudulent inducement of Plaintiffs into the purchase of the Vehicle by both intentional and negligent misrepresentations of facts, and by concealment of facts; against FORD for fraud in the performance of its obligations under the written warranty; against FORD for breach of its statutory obligations under the Song-Beverly Consumer Warranty Act under both the express and implied warranty provisions of the statute; and against FORD for violation of the Consumers Legal Remedies Act ("CLRA").

3.   Plaintiffs, JACQUES POWERS on behalf of BIG ISLAND CLIMBERS and ANGEL POWERS on behalf of BIG ISLAND CLIMBERS ON THE MAINLAND, INC., are individuals residing in the City of Lake Arrowhead, County of San Bernardino, State of California.

4.   Defendant FORD is and was a Delaware Corporation registered to do business in the State of California with its registered office in the City of Los Angeles, County of Los Angeles, State of California. At all relevant times herein, FORD was engaged in the business of designing, manufacturing, testing, constructing, assembling, inspecting, marketing, distributing, and selling motor vehicles, motor vehicle chassis, and motor vehicle components (including but not limited to engines and engine components) in the State of California, including in San Bernardino.

1    5.    Defendant SUNRISE FORD is and was a California Corporation, conducting business
2  in the County of San Bernardino, State of California. At all relevant times herein. SUNRISE FORD
3  was engaged in business as a motor vehicle dealership certified and authorized by FORD to sell
4  Ford-brand vehicles and vehicle components, and to perform service and repair of Ford-brand
5  vehicles pursuant to FORD's express written warranties.

6    6.    Plaintiffs do not know the true names and capacities, whether corporate, partnership,
7  associate, individual or otherwise of Defendants sued herein as Does 1 through 10, inclusive, under
8  the provisions of section 474 of the California Code of Civil Procedure. Defendants Does 1 through
9  10, inclusive, are in some manner responsible for the acts, occurrences and transactions set forth
10  herein, and are legally liable to Plaintiffs. Plaintiffs will seek leave to amend this Complaint to set
11  forth the true names and capacities of the fictitiously named Defendants, together with appropriate
12  charging allegations, when ascertained.

13    7.    All acts of corporate employees as alleged were authorized or ratified by an officer,
14  director, or managing agent of the corporate employer.

15    8.    Each Defendant, whether actually or fictitiously named herein, was the principal, agent
16  (actual or ostensible), or employee of each other Defendant, and in acting as such principal or within
17  the course and scope of such employment or agency, took some part in the acts and omissions
18  hereinafter set forth by reason of which each Defendant is liable to Plaintiff for the relief prayed for
19  herein.

20    9.    On October 28, 2005, Plaintiffs leased and subsequently purchased a new 2006 Ford F-350
21  Super Duty, VIN: 1FTWW31P36EB31215 ("the Vehicle"). On September 30, 2008, Plaintiffs
22  subsequently purchased the Vehicle at SUNRISE FORD's dealership in San Bernardino County.
23  The sales contract is attached and incorporated by this reference as **Exhibit 1**. The Vehicle was
24  covered by express written warranties by which FORD undertook to preserve or maintain the utility
25  or performance of the Vehicle or to provide compensation if there was a failure in such utility or
26  performance.

27    10.    Ford-brand vehicles equipped with the 6.0-liter engine were sold with FORD's Limited
28  Warranty (including the 6.0-liter Powerstroke Diesel Engine warranty terms), which covered the

-3-

POWERS v. FORD COMPLAINT

"engine and engine components against defects in factory-supplied materials or workmanship for five years after the warranty start date or 100,000 miles, whichever occurs first." and provides that "[d]uring this coverage period, authorized Ford Motor Company dealers will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship."

11.    The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to warranty and it developed other serious defects and nonconformities to warranty including a defective 6.0-liter engine, as detailed herein.

12.    Plaintiffs hereby revoke acceptance of the sales contract.

13.    Pursuant to the Song-Beverly Consumer Warranty Act (Civil Code sections 1790 *et seq.*, hereinafter the "Act"), the Vehicle constitutes "consumer goods" used primarily for family or household purposes, and Plaintiffs have used the Vehicle primarily for those purposes.

14.    Plaintiffs are "buyers" of consumer goods under the Act.

15.    Defendant FORD is a "manufacturer" and/or "distributor" under the Act.

### FORD'S DEVELOPMENT AND KNOWING DISTRIBUTION OF THE
### DEFECTIVE 6.0-LITER DIESEL ENGINE

16.    FORD obtained its 6.0-liter diesel engines from its supplier, Navistar International Transportation Corporation (hereinafter "Navistar").

17.    At all times relevant to this action, FORD was aware of severe and pervasive defects in the 6.0-liter diesel engine.

18.    The defects in the 6.0-liter engine caused FORD to delay the launch of vehicles equipped with the engine from a planned August 1, 2002 launch date until November 4, 2002.

19.    On May 15, 2002, as FORD was planning production of its first vehicles to be equipped with 6.0-liter diesel engines, Charlie Freese, FORD's Chief Engineer of Diesel Engines, identified "multiple high risk items" with the 6.0-liter diesel engines which would delay the production start. They included injection control pressure sensor (ICP) failures, piston failures, and injector failures, which were "of particularly great concern." The problems were so serious that FORD considered extending production of the predecessor 7.3-liter diesel engine in place of the 6.0-liter diesel engine.

///

-4-

POWERS v. FORD COMPLAINT

20.     On May 29, 2002, just four days before the scheduled kick-off of 6.0-liter diesel engine production, Freese identified additional "major issues" with the 6.0-liter engine in addition to the ICP failures, piston failures, and injector failures. Those "new concerns" included, among others, problems with the head gaskets, turbo charger, the engine idle, and the injector driver module (IDM).

21.     On July 30, 2002, FORD held a New Model Launch Meeting at which FORD projected that some problems could not be resolved until after the vehicles were already being produced and sold. At that same meeting, FORD reviewed the readiness of suppliers for the planned vehicles, and singled out and rated Navistar (the supplier of the 6.0-liter engine) as "High Risk" due to lack of durability testing and late design changes.

22.     By August 23, 2002, FORD still was addressing injector defects causing idle problems, cold start problems, engine stall problems, and injector failures. Although Navistar sent engines with new process injectors to FORD, the durability tests for these engines were not scheduled for completion until the week of October 9, 2002, less than a month before production was to begin.

23.     As the November 4, 2002 production date neared, problems with the 6.0-liter engine persisted and FORD was unable to determine their root cause. Nonetheless, FORD decided it could not continue delaying the launch and instead began producing and selling the vehicles, despite knowing that the 6.0-liter diesel engine was defective.

24.     On November 12, 2002, Steven Henderson, a FORD executive, wrote that FORD was "in the middle of the 6.0L launch, and … things are not going well." Although the launch was delayed a week, and the entire Navistar team was working full time, the problems were "not fully resolved yet."

25.     Without remedying the defects, FORD continued to equip subsequent model years of its trucks, including the 2006 Ford F-350, with the 6.0-liter diesel engine. Regardless of tweaks made to the 6.0-liter engine by FORD during subsequent years, these same defects to the engine persisted throughout FORD's production and sale of vehicles with this engine.

26.     As early as July 2003, FORD received information from its dealerships nationwide concerning customer complaints about the defects, and the dealers' inability to resolve the defects,

-5-

POWERS v. FORD COMPLAINT

and implemented specific measures to communicate information to its dealerships, which included:

    a. A specialized website for technical communications to dealership personnel about the 6.0-liter diesel engine and its problems;

    b. Incentivizing diesel technicians to use the website;

    c. Conducting weekly round-tables between FORD personnel and dealership personnel concerning the defects; and

    d. Communicating the latest 6.0-liter issues to dealership sales personnel via weekly messages on its specialized website "FMCDealer.com" and dedicated "Fordstar" broadcasts for sales personnel.

27. By March 2004, Frank Ligon, FORD's Director of Service Engineering Operations, suggested that John Koszewnik, FORD's Director of North American Diesel, personally attend meetings of FORD's "dealer council" to explain the 6.0-liter engine problems to dealership personnel in response to their concerns, but believed "we're going to be dealing with this issue for the forseeable future" [sic] and that "Customer think Diesels are supposed to last forever!" [sic].

28. By August 2004, Mr. Ligon received information from a Ford Customer Service Division Regional Manager that dealerships were "throwing in the towel and pre-disposing customers that Ford will buy back" defective 6.0-liter trucks, which was "symptomatic of numerous instances of 6.0L diesel problems growing in the field." Mr. Ligon responded to the Regional Manager by outlining the distribution of FORD-approved information on Ford's websites but also noted that there was no "definitive repair action or production parts to address this repair universe."

29. FORD's inability to deal with the problems continued through the 2006 model year. In a July 22, 2005 memorandum, Chris Bolen, FORD's director of North America Powertrain Manufacturing, wrote that the problems with the quality of the 6.0-liter engines were having "disastrous effects on this customer and segment."

30. In January 2006 – nearly four years after problems first surfaced, and as production and sale of the affected vehicle models were still underway – a FORD engineering study conducted an analysis of warranty claims to determine the root causes of the problems that continued to plague the 6.0-liter engine. FORD attributed the problems to "the same root cause": "injector sealing

-6-

POWERS v. FORD COMPLAINT

1  issues" – specifically, leaks between the fuel rail, combustion chamber, and coolant jacket.

2      31.    Evidence of the inherent nature of the defects again emerged in June 2006, when FORD

3  engineers discovered that 6.0-liter engines exceeded FORD's own cylinder pressure specifications

4  for "normally" performing engines. The issue was raised after a Ford-brand dealership suggested a

5  defective engine could be blamed on an aftermarket part; the aftermarket part manufacturer disputed

6  blame by pointing out FORD's own published information discussing excessive cylinder pressures

7  caused by engine defects, not by aftermarket parts. One engineer, Mike Frommann, in a June 2006

8  email, worried that these specifications might be published or subpoenaed, and could cause FORD

9  to "face a class action." *He recommended that all emails discussing the issue be deleted.*

10      32.    In January 2007, nearly five years after it discovered the defects, FORD sued the engine

11  supplier, Navistar, for what it termed "exceptionally high repair rates and warranty costs due to

12  quality problems attributable to Navistar," including "design flaws." The details of this litigation

13  were not made public record, and were in fact sealed.

14  <div align="center">**FORD'S PUBLIC STATEMENTS**</div>

15  <div align="center">**CONCERNING THE 6.0-LITER DIESEL ENGINE**</div>

16      33.    Despite FORD's knowledge of the defective engine, it continued to represent that the

17  Vehicle was of high quality and reliable.  For example, Mark Fields, FORD's President of the

18  Americas, publicly proclaimed that the 6.0-liter engine – the very same engine whose design and

19  quality issues led FORD to sue Navistar – was a "great engine." Despite its knowledge of the 6.0-

20  liter engine's many flaws and quality concerns, FORD trained its dealers throughout the country to

21  specifically tout the supposedly superior attributes of the engine, without ever mentioning its

22  troubled history of design, manufacturing, and reliability defects.

23          a.    FORD continued to misrepresent the qualities of, and conceal its true knowledge of,

24              the defective engine in its marketing materials, in an effort to protect the "Ford" brand

25              and to keep both potential customers and existing customers from learning that the

26              engine was in fact defective.

27  ///

28  ///

<div align="center">-7-</div>

<div align="center">POWERS v. FORD COMPLAINT</div>

b.  The promotional materials stated that the 6.0-liter diesel engine is the "longest lasting diesel motor" and that "altogether, the 6.0 L Power Strike is the longest lasting diesel in its class."

c.  These promotional materials also touted the 2006 Ford F-350 as having: "The best payload, best conventional towing, best braking performance, highest GVWR, unsurpassed GCWR, . . ., best 5th wheel towing."

d.  These promotional materials also touted the 2006 Ford F-350 as "best-in-class: horsepower, gas torque, unsurpassed diesel horsepower."

e.  These promotional materials advertised that the Super Duty powertrain, which includes the 6.0-liter diesel engine, "delivers the right power, right when you need it," and that the "powertrain delivers the muscle to get the job done."

f.  These promotional materials represented that the 2006 Ford F-350 has the strength to handle the toughest assignments and the 6.0-liter diesel engine is built "Ford tough."

g.  These promotional materials represented that the 6.0-liter engine has "best-in-class torque" and "best-in-class diesel horsepower."

h.  These promotional materials represented : "The all-new 32-valve 6.0 L Power Stroke V8 turbo diesel generates so much power that an entirely new automatic transmission has been developed to handle the increased loads."

i.  These promotional materials represented also represented that the 6.0-liter engine was reliable and well-made, and that the 2006 Ford F-350 and other vehicles with this engine have superior towing capacity and capabilities.

j.  These promotional materials represented advertised the 2006 Ford F-350, and its 6.0-liter engine, as high-quality products that were free from inherent defects.

34.     FORD never acknowledged the defective nature of the 6.0 liter engine or its catastrophic repair rates in its public filings with the Securities and Exchange Commission, further concealing this information from the public.

///

///

-8-

POWERS v. FORD COMPLAINT

## FORD'S FAILURE TO RESOLVE OR DISCLOSE
## THE ENGINE DEFECTS

35.     Throughout FORD's production and sale of the engines, FORD never developed a repair plan in which FORD would comply with the above warranties by identifying and eliminating the root cause of defects to the 6.0-liter engines. As detailed in the September 7, 2004 memorandum from Frank Ligon, FORD's Director of Service Engineering Operations, FORD did "not have a definitive repair action or production parts to properly address the concern universe." As revealed in an October 2004 email between FORD executives, FORD rejected pilot programs that would have had FORD technical experts assist dealerships with repairs.

36.     Nor did FORD implement a voluntary recall program that would have required FORD to completely repair or replace the defective engines. FORD executives had suggested that FORD authorize full and complete repairs of defective engines – essentially throwing the "kitchen sink" at the vehicle in order to help eliminate the need for subsequent repairs. However, in an email on October 8, 2004, Michael Berardi, FORD's CBG manager, said "[t]hat particular philosophy is opposite of what we have been training our dealers to do and could lead to a very expensive warranty bill across vehicle lines."

37.     FORD instead had authorized dealers implement a "Band-Aid" strategy that allowed the dealers to take only limited repair measures, such as cleaning or replacing individual components, which did not properly remedy or resolve the underlying defect. This strategy reduced FORD's warranty spending but did nothing to fix the underlying root causes of the defects.

38.     In 2006, for example, among FORD's "6.0-liter Top Parts Warranty Actions" were new procedures adopted to address "turbo coking" and "EGR coking," issues that had plagued the engine since its inception. According to a July 2007 email between FORD executives, rather than replace the coked turbo charger or EGR valve, FORD commenced a program in mid-2006 of simply "cleaning" the parts in question. thus saving FORD a projected $9 million and $2.5 million in warranty spending, respectively, on those two items.

39.     These minor. limited measures merely addressed the symptoms.  For example, the removal of built up soot effectively concealed the seriousness and extent of the underlying root

-9-

POWERS v. FORD COMPLAINT

cause – poor combustion. FORD's own study concluded that the cause was improper injector sealing and associated leaks. Moreover, these measures misled customers to believe that the underlying problem had been fixed, when in fact the symptom likely would reoccur on a later date, possibly when the warranty would have expired, typically forcing the additional expenses to be borne by the customer rather than by the dealer. These measures prevented customers from realizing the defective nature of their engine.

40.     In FORD's own analysis of the multitude of warranty claims on the troubled 6.0-liter engine, it concluded that the problems associated with the 6.0-liter engine were the result of "the same root cause." As noted above, FORD had attributed the problems to "injector sealing issues." Specifically, leaks between the fuel rail, combustion chamber, and coolant jacket.

41.     Despite having this critical knowledge, FORD concealed it from consumers, and continuously treated the symptoms rather than the underlying "root cause" of the problem. FORD has never publicly acknowledged this root cause.

42.     In addition, FORD has computer systems whereby it monitors warranty claims, communicates with its authorized dealers, and monitors the malfunctions and repair records of all these vehicles. These systems include MORS (Master Owner Relations System), AWS (Analytical Warranty System), and CQIS (Common Quality Indicator System).

43.     Through these systems, FORD has detailed information regarding each time a vehicle is brought into a Ford-brand dealership for repair, including but not limited to the symptoms that required the unit be brought in for service, the diagnosis of the problem, the repair authorized by FORD, and the work performed on the vehicle.

44.     FORD accumulated a massive database through which it realized that the minor, limited work it was authorizing was inadequate to properly repair these defective engines, and major repairs, including engine replacement, were necessary to address these defects.

45.     FORD engineers referred to the failing parts as the "usual suspects." In a presentation dated July 10, 2007, FORD stated, "Causal parts are the usual suspects – Cylinder Head/Head Gasket, Engine Ass'y, EGR Cooler, EGR Valve."

///

-10-

POWERS v. FORD COMPLAINT

46.     FORD continued its practice of only authorizing minor, ineffective repairs of these engine defects. FORD unfairly benefitted by this practice because FORD knew that after the warranty expired, the vehicle owner, rather than FORD or its dealerships, would have to pay for all future repairs.

47.     Those "Band-Aid" repair strategies were performed on Plaintiff's Vehicle. FORD and its dealerships (which are FORD's authorized agents for warranty repairs), including but not limited to SUNRISE FORD, represented that the repairs would fix the Vehicle, despite their knowledge that the repairs performed would merely postpone the problem in the 6.0-liter Navistar diesel engine until the engine was out of warranty.

## PLAINTIFFS' RELIANCE ON
## FORD'S PUBLIC STATEMENTS

48.     Prior to Plaintiffs deciding to purchase the Vehicle, Defendants FORD and SUNRISE FORD distributed promotional materials for the 2006 Ford F-350 with the 6.0-liter diesel engine, as described in Paragraph 33 above.

49.     Plaintiffs observed the promotional material generated by FORD and disseminated by both FORD and SUNRISE FORD which represented the superior qualities of the 2006 Ford F-350 truck.

50.     Plaintiffs believed and relied on these written representations concerning the qualities and capabilities of the 2006 Ford F-350 and its 6.0-liter diesel engine when making the decision to purchase the Vehicle.

51.     Plaintiffs purchased the Vehicle for recreational purposes.  Specifically, Plaintiffs wanted a long-lasting truck that could offer superior horsepower and torque.

52.     Prior to Plaintiffs deciding to purchase the Vehicle, Plaintiffs were led by the sales personnel at SUNRISE FORD, an authorized seller of Ford-brand vehicles, that 2006 Ford F-350 vehicles equipped with a 6.0-lier engine would offer superior power and tow capacity.  Plaintiffs truly believed that Plaintiffs were making a wise investment decision in purchasing the Vehicle.

53.     Plaintiffs believed and relied on these verbal representations made by the sales personnel at SUNRISE FORD concerning the qualities and capabilities of the 2006 Ford F-350 and the 6.0-

-11-

POWERS v. FORD COMPLAINT

1    liter diesel engine when making the decision to purchase the Vehicle.

2        54.     Based on the foregoing written and verbal representations by FORD and its authorized

3    agents, on which Plaintiffs reasonably relied. Plaintiffs purchased the Vehicle at SUNRISE FORD

4    on September 30, 2008.

5        55.     Despite FORD's and SUNRISE FORD's representations and advertisements to the

6    contrary, FORD's 6.0-liter diesel engines in general have had severe and pervasive quality defects,

7    which FORD and SUNRISE FORD failed to disclose to consumers.  As a result of these defects.

8    Ford-brand trucks equipped with the 6.0-liter engine. including the 2006 Ford F-350. have exhibited

9    continuing problems with turbo charger systems, fuel injection systems, head gaskets, EGR valves,

10   cooling systems and coolers plugging, and many other problems.

11       56.     As described in detail below, FORD and its dealerships, including but not limited to

12   SUNRISE FORD: (a) rather than identifying and eliminating the root cause of these defects,

13   produced and sold the 2006 Ford F-350 to Plaintiffs and other consumers. knowing it contained a

14   defective engine; (b) adopted through its dealers, including but not limited to SUNRISE FORD. a

15   Band-Aid strategy of offering minor, limited repair measures to customers who sought to have the

16   defects remedied, a strategy that reduced FORD's warranty expenditures but did not resolve the

17   underlying defects and, in fact, helped to conceal the defects until the applicable warranties expired;

18   and (c) intentionally and fraudulently concealed from Plaintiffs and other consumers the existence

19   of these defects prior to the sale or any time thereafter, and fraudulently concealed from Plaintiffs

20   its inability to repair these inherent defects, which prevented the truck from conforming to its

21   applicable warranties.

22                        **PLAINTIFFS' PROBLEMS WITH THE VEHICLE**

23                             **AND REPAIR ATTEMPTS**

24       57.     After purchasing the Vehicle, Plaintiffs began experiencing problems with the Vehicle's

25   6.0-liter engine.  Specifically, the Vehicle cranked but would not start. produced a rattling noise

26   from under the center of the truck, and leaked oil.  In addition, the Vehicle suffered from problems

27   with the turbo and loss of power.

28   ///

                                            -12-

58.     These problems caused Plaintiffs to experience numerous difficulties, including an inability to tow.

59.     FORD, through its authorized repair facilities, has attempted to make repairs to the Vehicle's engine on multiple occasions and failed to permanently remedy the Vehicle's persistent problems.

60.     These ongoing problems have impaired the use, value, and safety of the Vehicle.

61.     Plaintiffs attempted to have the engine issues fixed on many occasions.  Each time, the dealership's mechanics tried the same or different remedies, but the problems with the engine persisted.

62.     FORD and its authorized repair facilities continually represented that the repairs "fixed" the problems with Plaintiffs' 6.0-liter engine.  Plaintiffs relied on FORD's representations, and its authorized repair facilities' representations, that the repairs "fixed" the problems.

## ALL STATUTES OF LIMITATION ARE TOLLED BY THE DISCOVERY RULE
## AND THE DOCTRINE OF FRAUDULENT CONCEALMENT

63.     FORD and SUNRISE FORD misrepresented the quality, engine capacity, and towing capacity of the 6.0-liter Navistar diesel engine to Plaintiffs at the time of the sale of the Vehicle.

64.     FORD and SUNRISE FORD continued to misrepresent their ability to repair the Vehicle in conformity with the warranty throughout the warranty period.

65.,    At all relevant times, FORD and SUNRSIE FORD were aware of the defects in the 6.0-liter Navistar diesel engine.

66.     At all relevant times, FORD and SUNRISE FORD were aware of FORD's inability to repair the defects in the 6.0-liter Navistar diesel engine.

67.     These defects were known by FORD and SUNRISE FORD to cause serious problems, including stalling, non-starting, oil leaks, power loss, and smoking.  If and when such symptoms manifest during operation of the Vehicle they pose a serious threat of personal injury to Plaintiffs, to passengers, and third parties.

68.     FORD and SUNRISE FORD had a duty to disclose the concealed facts alleged above because FORD and SUNRISE FORD knew that Plaintiffs did not know a material fact, and further

-13-

1 | knew that such facts were not readily accessible to the Plaintiffs because they actively concealed
2 | those facts.

3 |     69.    FORD and SUNRISE FORD had a duty to disclose the concealed facts alleged above,
4 | because FORD made several partial or misleading half-truths in its marketing materials, which were
5 | also disseminated by SUNRISE FORD, and through their authorized sales representatives about the
6 | quality, characteristics, reliability, and towing capacity of the 6.0-liter Navistar diesel engine.

7 |     70.    FORD and SUNRISE FORD had a duty to disclose the concealed facts alleged above
8 | because they actively concealed material facts in order to induce a false belief.

9 |     71.    FORD and SUNRISE FORD intended for Plaintiffs to rely on those misrepresentations
10 | to conceal the fact that the Vehicle's engine could not be repaired.

11 |     72.    Prior to the sale of the Vehicle, and at all times thereafter, FORD and SUNRISE FORD
12 | therefore failed to disclose the existence of the Vehicle's inherent defects to Plaintiffs, and FORD
13 | and its authorized repair facilities failed to disclose their inability to repair these inherent defects,
14 | which prevented the Vehicle from conforming to its applicable warranties. Further, from and after
15 | the sale of the 2006 Ford F-350, FORD and SUNRISE FORD fraudulently concealed from
16 | purchasers, including Plaintiffs, the fact that Ford-brand dealerships and authorized repair facilities
17 | were not properly repairing the defects to the 6.0-liter engine, and knew that the limited work that
18 | FORD had authorized its dealerships to perform on those vehicles would not properly repair them.

19 |     73.    When Plaintiffs took the Vehicle to its authorized repair facilities for repairs, FORD and
20 | its authorized repair facilities continually represented that the repairs "fixed" the problems with
21 | Plaintiff's 6.0-liter engine. Plaintiff relied on FORD, and its authorized repair facilities'
22 | representations that the repairs "fixed" the problems.

23 |     74.    It was not until October of 2018, when Plaintiffs were driving to Arizona and noticed
24 | several Ford heavy-duty trucks of similar model/year had broken down on Highway 18 that
25 | Plaintiffs first discovered, or reasonably could have discovered, that FORD's previous repairs to
26 | the engine during the express warranty period had failed to conform Plaintiffs' Vehicle to the
27 | express warranty. At that point, Plaintiffs also realized that the engine problems they experienced
28 | with the Subject Vehicle were not limited to their individual vehicle alone, but that there was a

1    more widespread issue among Ford heavy-duty trucks and that FORD had engaged in a scheme to

2    defraud consumers, including Plaintiffs.

3        75.    At that time, Plaintiffs first discovered or reasonably could have discovered that FORD

4    and SUNRISE FORD had misrepresented the engine quality and their ability to maintain the

5    Vehicle under warranty, to intentionally prevent Plaintiffs from discovering the irreparable non-

6    conformities in the Vehicle. Plaintiffs could not have discovered this on an earlier date, despite a

7    reasonable and diligent investigation, because of FORD's and SUNRISE FORD's fraudulent

8    misrepresentations and concealment of the defects in the 6.0-liter engine in Plaintiffs' Vehicle, as

9    alleged in Paragraphs 16 through 56 above, and because of the repeated false assurances of FORD

10   and its authorized dealership agents, on which Plaintiffs reasonably relied, that FORD and

11   SUNRISE FORD had repaired and would repair any problems with the engine in Plaintiffs' Vehicle

12   during the express warranty period.

13       76.    The statutes of limitation for each of Plaintiffs' claims against FORD and SUNRISE

14   FORD were therefore tolled under the delayed discovery rule and the doctrine of fraudulent

15   concealment until Plaintiffs first discovered in or around October of 2018 that FORD and SUNRISE

16   FORD had failed to conform Plaintiffs' Vehicle to the express warranty.

17       77.    Because FORD and SUNRISE FORD failed to disclose these foregoing facts to

18   Plaintiffs, all statute of limitations periods with respect to claims arising from the sale of the Vehicle

19   were tolled by the doctrines of fraudulent concealment, the discovery rule, and/or equitable

20   tolling/estoppel. As alleged herein, FORD and SUNRISE FORD wrongfully concealed the facts

21   (1) that FORD was equipping the trucks with defective engines that FORD and SUNRISE FORD

22   were unable or unwilling to repair, and (2) that FORD and its authorized repair facilities, including

23   but not limited to SUNRISE FORD, were making inadequate repairs that were incapable of

24   addressing the root cause of the trucks' malfunctions.

25       78.    Plaintiffs did not discover, and through the exercise of reasonable diligence could not

26   have discovered, the operative facts that are the basis of the claims alleged herein because the facts

27   were concealed in confidential and privileged documents, which a consumer would not know about

28   and could not obtain.

-15-

POWERS v. FORD COMPLAINT

79.     No amount of diligence by Plaintiffs could have led to the discovery of these facts because they were, and continue to be, kept secret by FORD and SUNRISE FORD: therefore, Plaintiffs were not at fault for failing to discover these facts.

80.     Plaintiffs did not have actual knowledge of facts sufficient to put Plaintiffs on notice. Plaintiffs did not know, nor could Plaintiffs have known, about FORD's and SUNRISE FORD's inability to repair the defects in 6.0-liter diesel engines because, as alleged above, FORD and SUNRISE FORD kept this information highly confidential, and SUNRISE FORD assured Plaintiffs that repairs were effective. FORD went through great lengths to ensure that such information remained confidential as explained in detail in Paragraphs 16 through 56 above.

## ALL STATUTES OF LIMITATION
## ARE TOLLED BY EQUITABLE ESTOPPEL

81.     FORD and SUNRISE FORD, and their authorized agents, made repeated representations to Plaintiffs that the Vehicle was repaired.

82.  On November 9, 2005, Plaintiffs delivered their 2006 Ford F-350 to an authorized FORD repair facility because the Vehicle was pulling left when braking, driving, and steering.  FORD's authorized service personnel attempted to repair the Vehicle by performing a wheel alignment, adjusting the toe to center steering wheel, and replacing the front brake pads.  When the Vehicle was returned to Plaintiffs, FORD's authorized service personnel represented to Plaintiffs that their Vehicle was fixed.  Plaintiffs reasonably relied on these representations.

83.     On February 10, 2006, Plaintiffs delivered the 2006 Ford F-350 to an authorized FORD repair facility, because there was a rattling and howling noise coming from under the center area of the truck after driving for a while.  FORD's authorized service personnel attempted to perform some engine repair on the Vehicle.  When the Vehicle was returned to Plaintiff, FORD's authorized service personnel represented to Plaintiff that the Vehicle was fixed.  Plaintiff reasonably relied on these representations.

84.  On November 17, 2006, Plaintiffs delivered their 2006 Ford F-350 to a repair facility because the engine was cranking and not starting.  The service personnel attempted to repair the Vehicle by reinstalling the FICM and PCM, and reprogramming the PCM, TCM, and FICM.  When the Vehicle

-16-

POWERS v. FORD COMPLAINT

1 | was returned to Plaintiffs, the service personnel represented to Plaintiffs that their Vehicle was fixed.

2 | Plaintiffs reasonably relied on these representations.

3 |     85.     On September 21, 2007, Plaintiffs delivered their 2006 Ford F-350 to an authorized

4 | FORD repair facility because the engine was leaking oil. The authorized service personnel

5 | attempted to repair the Vehicle by installing oil dye to find the oil leak and installing a new O ring.

6 | When the Vehicle was returned to Plaintiffs, the FORD service personnel represented to Plaintiffs

7 | that their Vehicle was fixed. Plaintiffs reasonably relied on theses representations.

8 |     86.     Over the next five years, Plaintiffs delivered the 2006 Ford F-350 to repair facilities on

9 | numerous occasions due to serious engine issues. For instance, the engine would experience long

10 | cranks when cold, would not start when hot, produced loud clunking noises when driven, and ran

11 | rough. The service personnel attempted to repair the Vehicle on these occasions. When the Vehicle

12 | was returned to Plaintiffs, the service personnel represented to Plaintiffs that the Vehicle was fixed.

13 | Plaintiffs reasonably relied on these representations.

14 |     87.     Plaintiffs were never informed by FORD or its authorized dealers, including but not

15 | limited to SUNRISE FORD, that the issues exhibited by Plaintiffs' Vehicle during the warranty

16 | period were related to a known, widespread defect in the engine, and that Plaintiffs' Vehicle

17 | exhibited different symptoms from the same underlying engine defect. FORD went through great

18 | lengths to ensure that such information remained confidential, and would not be disseminated to

19 | the public as explained in detail in Paragraphs 16 through 56 above.

20 |     88.     At all points at which FORD and its authorized agents, including but not limited to

21 | SUNRISE FORD, made representations about Plaintiffs' Vehicle being repaired, Defendant and its

22 | authorized agents were aware that the repairs performed on the Vehicle would not permanently

23 | repair the Vehicle and did not conform the Vehicle with the terms of the warranties provided.

24 |     89.     Plaintiffs relied on Defendants' and their authorized agent's representations that the

25 | Vehicle was repaired and that Defendants conformed the Vehicle to the terms of the warranties.

26 |     90.     Plaintiffs were reasonable in reliance on Defendant's representations about its ability to

27 | repair the Vehicle.

28 | ///

-17-

91.     Plaintiffs did not, and could not, know that Defendant was unable to repair the Vehicle because of Defendant's repeated misrepresentations about the sufficiency of the repairs performed.

## FIRST CAUSE OF ACTION

### Fraud in the Inducement - Intentional Misrepresentation

### (Against All Defendants)

92.     Plaintiffs' fraud-based claims in this cause of action arise from the following factual circumstances, by which FORD and SUNRISE FORD induced Plaintiffs to enter into a Retail Installment Sales Contract, attached hereto as **Exhibit 1**.  That Retail Installment Sales Contract and the facts surrounding the inducement to enter into such are separate and apart from any breach of warranty allegations made herein, which are based on a separate contract – the written or implied warranty provided by FORD at the time of sale of the Vehicle and performed by FORD and its authorized repair facilities, including but not limited to SUNRISE FORD.

### DEFENDANTS' INTENTIONAL MISREPRESENTATIONS

### ABOUT THE VEHICLE AND ITS 6.0-LITER DIESEL ENGINE

93.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and realleged.

94.     As set forth in Paragraph 33 above, FORD and SUNRISE FORD distributed promotional materials representing that the 2006 Ford F-350 has the strength to handle the toughest assignments; that the 6.0-liter diesel engine is built "Ford tough;" that the 6.0-liter engine has "best-in-class torque" and "best-in-class diesel horsepower;" that "The all-new 32-valve 6.0 L Power Stroke V8 turbo diesel generates so much power that an entirely new automatic transmission has been developed to handle the increased loads;" that the 6.0-liter engine was reliable and well-made; that the 2006 Ford F-350 and other vehicles with this engine have superior towing capacity and capabilities; and that the 2006 Ford F-350, and its 6.0-liter engine, were high-quality products that were free from inherent defects.

95.     Plaintiffs also observed many television commercials advertising the new 2006 Ford F-350 as equipped with one of the best diesel engines.

-18-

POWERS v. FORD COMPLAINT

96.     Prior to entering the sales contract to purchase the Vehicle, FORD and 2006 Ford F-350 made representations to Plaintiffs through printed marketing materials and through verbal representations by their authorized agents for communicating that information (2006 Ford F-350 and its employees).

97.     Prior to Plaintiffs' decision to purchase the Vehicle, the sales personnel at SUNRISE FORD represented to Plaintiffs that the 2006 Ford F-350 had superior horsepower and torque.

98.     At all relevant times, FORD and SUNRISE FORD knew the 2006 Ford F-350 had severe and pervasive design, manufacturing, and quality defects, including defects in its 6.0-liter Navistar engine; that the 2006 Ford F-350 would exhibit defects that would prevent the Vehicle from being merchantable; that the defects would substantially impair the use, value, or safety of the Vehicle; and that the Vehicle's defects would not be repaired and eliminated under the applicable warranties.

99.     Prior to Plaintiffs' execution of the sales contract for purchase of the Vehicle, FORD and SUNRISE FORD were aware that the changes to the 6.0-liter engine that FORD had performed in its unsuccessful attempts to eliminate the inherent defects of the engine had drastically reduced the power of the engine, such that 2006 Ford F-350 vehicles equipped with the 6.0-liter engine did not meet the supposedly superior towing and hauling capabilities touted by FORD in its marketing brochures for the truck. FORD and SUNRISE FORD nevertheless continued to falsely state in the marketing brochures for the 2006 Ford F-350 they provided to customers, including Plaintiffs, that the 2006 Ford F-350 with the 6.0-liter engine had "the best in class towing capacities" that allowed a customer to "tow what you want, where you want," and that the truck "is ready to tow the heaviest loads with the greatest of ease."

100.    Plaintiffs also observed many television commercials advertising the new 2006 Ford F-350 as equipped with one of the best diesel engines.

101.    Prior to entering the sales contract to purchase the Vehicle, FORD and SUNRISE FORD made representations to Plaintiffs through printed marketing materials and through verbal representations by their authorized agents for communicating that information (SUNRISE FORD employees).

///

-19-

POWERS v. FORD COMPLAINT

102.    Prior to Plaintiffs' decision to purchase the Vehicle, the sales personnel at SUNRISE FORD represented to Plaintiffs that the 2006 Ford F-350 had superior horsepower and torque.

## DEFENDANTS' INTENT AND PLAINTIFF'S RELIANCE
## ON DEFENDANTS' REPRESENTATIONS

103.    FORD and SUNRISE FORD, as alleged above, therefore intentionally made the foregoing misrepresentations of material facts to Plaintiffs concerning the qualities, attributes, and lack of defects of the 6.0-liter engine and the 2006 Ford F-350, including, but not limited to, false facts concerning the superior reliability and defect-free nature of the engine, the false fact that the engine is the best and most dependable diesel engine in its class, and false facts concerning the superior towing ability of the truck with the 6.0-liter engine, prior to Plaintiffs entering into the sales contract for purchase of the Vehicle, despite FORD's and SUNRISE FORD's knowledge that these representations of material facts made to Plaintiffs concerning the qualities, attributes, and lack of defects of the engine and the 2006 Ford F-350 were false at the time they were made.

104.    Each of the foregoing misrepresentations of fact by FORD and SUNRISE FORD were, as alleged above, authorized and ratified by their respective officers, directors, and/or managers, including but not limited to Charlie Freese (FORD's Chief Engineer of Diesel Engines), Steve Henderson (FORD Executive), Frank Ligon (FORD's Director of Service Engineering Operations), and Michael Berardi (FORD's CBG Manager), and others, who had knowledge of the falsity of these foregoing misrepresentations of fact but who nevertheless authorized and ratified these foregoing misrepresentations of fact made to Plaintiffs.

105.    FORD and SUNRISE FORD intended that Plaintiffs rely on the foregoing representations that the 2006 Ford F-350 did not have inherent and irreparable defects, and that the 2006 Ford F-350 had superior towing capacities and capabilities, to induce Plaintiffs to buy the truck.

106.    Plaintiffs justifiably and reasonably relied on FORD's and SUNRISE FORD's foregoing representations regarding the truck's lack of defects and its capabilities and qualities when deciding to purchase the Vehicle.

///

-20-

POWERS v. FORD COMPLAINT

107.   Plaintiffs were harmed, in part or in whole, as a result of reliance upon FORD's and SUNRISE FORD's representations, as Plaintiffs purchased a vehicle that Plaintiffs would not have otherwise purchased.

### HARM TO PLAINTIFFS AND DAMAGES

108.   Plaintiffs' reliance on FORD's and SUNRISE FORD's representations was a substantial factor in causing Plaintiffs harm.

### PLAINTIFFS' VEHICLE SUFFERED FROM THE KNOWN DEFECTS

109.   Subsequent to purchasing the Vehicle, Plaintiffs began experiencing problems with the Vehicle.  Plaintiffs took the truck to a FORD-authorized dealership for engine repairs on several separate occasions because of numerous problems with the engine.

110.   As the result of the repeated problems with Plaintiffs' Vehicle, in addition to other attempted repairs, FORD replaced many of the "usual suspects."

111.   FORD and SUNRISE FORD knew that the repairs performed on Plaintiffs' Vehicle would not remedy the issues with Plaintiffs' Vehicle.

112.   As a result of FORD's and SUNRISE FORD's fraudulent acts, Plaintiffs seek rescission of the contract, restitution of all payments made towards the Vehicle, and damages in an amount to be determined at the time of trial.

113.   As a result of FORD's and SUNRISE FORD's fraudulent acts, Plaintiffs also suffered diminution in the value of the Vehicle, out-of-pocket expenses, and damages in the amount of the difference between the value of the Vehicle equipped with the defective engine and the value of the Vehicle if it had been equipped as warranted.

### FORD'S CONDUCT WAS REPREHENSIBLE
### AND WARRANTS AN AWARD OF PUNITIVE DAMAGES

114.   FORD's and SUNRISE FORD's conduct in employing these unfair and deceptive sales practices was malicious, willful, recklessly disregarded the harm to consumers, and was so reprehensible as to warrant the imposition of punitive damages.

115.   In addition, FORD's and SUNRISE FORD's deliberate failure to disclose the defects to the 6.0-liter engine was undertaken on a massive scale.  Beginning in 2002 and continuing through

-21-

1   the 2006 production year and beyond, FORD did not make any disclosures to consumers, through

2   its dealerships or otherwise, regarding the engine defects in any of the model years for the "Super

3   Duty" product line.  Yet, by 2007, the 6.0-liter engine already had "unprecedented repair rates,"

4   according to Robert Fascetti, FORD's director of V-Engine and Diesel Engineering for the North

5   American Engine Organization.  In a sworn affidavit, Fascetti stated that repairs of the 6.0-liter

6   engine had accounted for "approximately 80% of all of Ford's warranty spending on engines."

7      116.    At the same time, FORD earned enormous profits as a result of its failure to disclose the

8   defects.  During the period that such vehicles were on the market, FORD's vehicles equipped with

9   the 6.0-liter engine provided FORD with high gross profit margins.  In addition, because engine

10   replacements cost more than ten times the cost of the lesser repairs implemented by dealers, FORD

11   profited enormously by refusing to authorize necessary major engine repairs or engine replacements

12   during the warranty period, instead only authorizing less expensive services (such as cleanings or

13   injector replacements), which were not adequate repairs and which would merely serve as a

14   temporary measure until the problems resurfaced after the warranty expired.

15      117.    The foregoing fraudulent and wrongful acts by FORD and SUNRISE FORD, as alleged

16   above, were authorized and ratified by their respective officers, directors, and/or managers,

17   including but not limited to Charlie Freese (FORD's Chief Engineer of Diesel Engines), Steve

18   Henderson (FORD Executive), Frank Ligon (FORD's Director of Service Engineering Operations),

19   and Michael Berardi (FORD's CBG Manager).  FORD's and SUNRISE FORD's agents or

20   employees also committed the wrongful acts set forth above with the foregoing knowledge,

21   authorization, approval, direction, or ratification of an officer, director, or managing agent of FORD

22   and SUNRISE FORD pursuant to implicit or explicit company plans, schemes, or policies regarding

23   the advertising and sale of Ford-brand trucks with 6.0-liter diesel engines.  Alternatively, the

24   aforementioned wrongful acts were committed by an officer, director, or managing agent of FORD

25   and SUNRISE FORD.

26      118.    Because of FORD's and SUNRISE FORD's fraudulent acts, and because of the

27   reprehensible nature and wide scale and profitability of FORD's and SUNRISE FORD's conduct,

28   an award of punitive damages is appropriate.

<div align="center">-22-</div>

<div align="center">POWERS v. FORD COMPLAINT</div>

119. In committing the foregoing acts of fraud pursuant to their respective policies and procedures for selling vehicles equipped with Navistar 6.0-liter engines, FORD and SUNRISE FORD were guilty of oppression, fraud, and/or malice as the terms are defined in Civil Code section 3294.

## SECOND CAUSE OF ACTION

### Negligent Misrepresentation

### (Against All Defendants)

120. Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and realleged.

121. Plaintiffs' fraud-based claims in this cause of action arise from the foregoing and following factual circumstances, by which FORD and SUNRISE FORD induced Plaintiffs to enter into a Retail Installment Sales Contract, attached hereto as **Exhibit 1**. That Retail Installment Sales Contract and the facts surrounding the inducement to enter into such are separate and apart from any breach of warranty allegations made herein, which are based on a separate contract – the written or implied warranty provided by FORD at the time of sale of the Vehicle.

122. FORD and SUNRISE FORD, through their authorized employees and agents, represented to Plaintiffs that the 2006 Ford F-350's 6.0-liter diesel engine did not have inherent defects, that the Vehicle would be free from inherent defects, and that any defects with the Vehicle could be repaired under the applicable warranties.

123. Although FORD and SUNRISE FORD may have honestly believed that the representation was true, FORD and SUNRISE FORD had no reasonable grounds for believing the representations were true when FORD and SUNRISE FORD made them.

124. At the time of the sale of the Vehicle, FORD and SUNRISE FORD knew the 2006 Ford F-350 had inherent defects, including defects in its 6.0-liter Navistar engine: that the 2006 Ford F-350would exhibit defects that would prevent the truck from being merchantable: that the 2006 Ford F-350 would exhibit defects that would substantially impair the use, value, or safety of the truck; and that the 2006 Ford F-35's defects could not be repaired and eliminated under the applicable

-23-

1  warranties.

2      125.    The representations were made at the time of the sale of the Vehicle to Plaintiffs and
3  throughout the warranty period.

4      126.    The foregoing defective condition of the 2006 Ford F-350 was known only to FORD
5  and SUNRISE FORD. and Plaintiffs could not discover those defects and did not discover them
6  until after years of using the Vehicle.

7      127.    FORD and SUNRISE FORD at all relevant times actively concealed the 2006 Ford F-
8  350's known, inherent defects from the public, including Plaintiffs.

9      128.    FORD's and SUNRISE FORD's representations were not true.

10     129.    FORD  and  SUNRISE  FORD  had  no  reasonable  grounds  for  believing  the
11  representations were true when FORD and SUNRISE FORD made them.

12     130.    FORD's  and  SUNRISE  FORD's  misrepresentations  were  material  to  Plaintiffs'
13  decision to buy the truck.  Plaintiffs would not have bought the 2006 Ford F-350 had Plaintiffs
14  known the truth about the defects in the engine.

15     131.    FORD and SUNRISE FORD were negligent in making these representations, which
16  induced Plaintiffs to buy the Vehicle.

17     132.    Plaintiffs reasonably relied on FORD's and SUNRISE FORD's representations.

18     133.    Plaintiffs were harmed, in part or in whole. as a result of FORD's and SUNRISE
19  FORD's negligent misrepresentations.

20     134.    Plaintiffs' reliance was a substantial factor in causing Plaintiffs harm.

21     135.    As a result of FORD's and SUNRISE FORD's fraudulent acts. Plaintiffs seek rescission
22  of the contract, restitution of all payments made towards the Vehicle, and damages in an amount to
23  be determined at the time of trial.

24     136.    As a result of FORD's and SUNRISE FORD's fraudulent acts. Plaintiffs also suffered
25  diminution in the value of the Vehicle, out-of-pocket expenses. and damages in the amount of the
26  difference between the value of the Vehicle equipped with the defective engine and the value of the
27  Vehicle if it had been equipped as warranted.

28  ///

-24-

POWERS v. FORD COMPLAINT

137.    FORD and SUNRISE FORD knew, or was negligent of the fact, that if they disclosed the 2006 Ford F-350's defects and their inability to repair them, Plaintiffs would not purchase the truck.

138.    Through the above-described deceitful tactics, FORD's and SUNRISE FORD's negligent misrepresentation led Plaintiffs into purchasing a truck that Plaintiffs would not have otherwise purchased.

139.    FORD and SUNRISE FORD had a pattern and practice of committing similar misrepresentations.

140.    In committing the above-described wrongful acts, FORD and SUNRISE FORD were guilty of oppression, fraud, or malice, because the acts were perpetrated pursuant to FORD's and SUNRISE FORD's plans, schemes, or company policies to deceive, defraud, mislead, or take unfair advantage of buyers of Ford-brand trucks with 6.0-liter diesel engines.

141.    The foregoing fraudulent and wrongful acts, as alleged above, were authorized and ratified by FORD's and SUNRISE FORD's respective officers, directors, and/or managers, including but not limited to Charlie Freese (FORD's Chief Engineer of Diesel Engines), Steve Henderson (FORD Executive), Frank Ligon (FORD's Director of Service Engineering Operations), and Michael Berardi (FORD's CBG Manager).  FORD's and SUNRISE FORD's agents or employees also committed the wrongful acts set forth above with the foregoing knowledge, authorization, approval, direction, or ratification of an officer, director, or managing agent of FORD and SUNRISE FORD pursuant to an implicit or explicit company plan, scheme, or policy regarding the advertising and sale of Ford-brand trucks with 6.0-liter diesel engines.  Alternatively, the aforementioned wrongful acts were committed by an officer, director, or managing agent of FORD and/or SUNRISE FORD.

### THIRD CAUSE OF ACTION

#### Fraud in the Inducement – Concealment

#### (Against All Defendants)

142.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and realleged.

-25-

143.    Plaintiffs' fraud-based claims in this cause of action arise from the foregoing and following factual circumstances, by which FORD and SUNRISE FORD induced Plaintiffs to enter into a Retail Installment Sales Contract, attached hereto as **Exhibit 1**. That Retail Installment Sales Contract and the facts surrounding the inducement to enter into such are separate and apart from any breach of warranty allegations made herein, which are based on a separate contract – the written or implied warranty provided by FORD at the time of sale of the Vehicle.

## FORD AND SUNRISE FORD CONCEALED IMPORTANT FACTS

144.    FORD and SUNRISE FORD, through their authorized employees and agents, intentionally concealed the fact that the 2006 Ford F-350 was equipped with a defective Navistar 6.0-liter diesel engine, which FORD could not repair under its express written warranty, that the 2006 Ford F-350 would exhibit defects that would prevent the truck from being merchantable, that the 2006 Ford F-350 would exhibit defects that would substantially impair the use, value, or safety of the truck, and that the 2006 Ford F-350's defects could not be repaired and eliminated under the applicable warranties.

145.    Information regarding these defects, which relate to the truck's reliability, cost to maintain, value, and safety, is material to a reasonable consumer in deciding whether to purchase a vehicle.

146.    These facts were only known to FORD and SUNRISE FORD and Plaintiffs could not have discovered these facts.

147.    FORD and SUNRISE FORD had a duty to disclose information on the 2006 Ford F-350's defects, because it possessed exclusive and superior knowledge of the defects.

148.    FORD and SUNRISE FORD actively concealed these important facts from Plaintiffs or prevented them from discovering these facts by failing to disclose the defects in any manner and by representing that the defects could be repaired, even though they knew the defects could never be repaired.

149.    FORD and SUNRISE FORD were aware of the defects in the 6.0-liter Navistar diesel engine and owed a duty to disclose the defective properties of their products to Plaintiffs because FORD and SUNRISE FORD had exclusive and superior knowledge of material facts, to wit the

-26-

POWERS v. FORD COMPLAINT

1   defective properties of its products, which facts were not available to Plaintiffs.

2       150.    FORD and SUNRISE FORD intentionally concealed the fact that the 6.0-liter Navistar

3   diesel engine suffered from what FORD internally referred to as "the usual suspects:" was

4   irreparable, and did not have the towing capacity or the quality for which it was advertised.

5       151.    The foregoing fraudulent concealment of facts were authorized and ratified by FORD's

6   and SUNRISE FORD's officers, directors, and/or managers, including but not limited to Charlie

7   Freese (FORD's Chief Engineer of Diesel Engines), Steve Henderson (FORD Executive), Frank

8   Ligon (FORD's Director of Service Engineering Operations), and Michael Berardi (FORD's CBG

9   Manager), who had knowledge of the foregoing inherent and irreparable defects of the 6.0-liter

10   engine in the 2006 Ford F-350, but who nevertheless authorized and ratified the concealment of

11   these foregoing defects from consumers, including Plaintiffs.

12       152.    Plaintiffs could not have discovered the concealed facts.

13       153.    The concealed facts, had they been known to Plaintiffs, would have been material to

14   Plaintiffs' decision to buy the truck, and if Plaintiffs would have known the concealed facts,

15   Plaintiffs would not have bought the 2006 Ford F-350.

16   ### DEFENDANTS' INTENT AND

17   ### PLAINTIFFS' REASONABLE RELIANCE

18   154.    FORD and SUNRISE FORD knew that if they disclosed the 2006 Ford F-350's inherent

19       defects and its inability to repair them, Plaintiffs and other consumers would not purchase the

20       2006 Ford F-350 trucks, including the Vehicle.

21   155.    Through the above-described deceitful tactics, Defendants tricked Plaintiffs into

22       purchasing a truck that Plaintiffs would not have otherwise purchased.

23   156.    FORD and SUNRISE FORD intended to deceive Plaintiffs by concealing the foregoing

24       facts from Plaintiffs so that Plaintiffs would purchase the SUNRISE FORD, an irreparable,

25       defective vehicle with lower towing capacity and quality than advertised.

26   157.    At the time of sale of the Vehicle, Plaintiffs reasonably relied on FORD's and SUNRISE

27       FORD's deception.

28   ///

-27-

**HARM TO PLAINTIFFS**

158.    Plaintiffs' reliance on FORD's and SUNRISE FORD's concealment was a substantial factor in causing Plaintiffs harm.

159.    As a result of FORD's and SUNRISE FORD's fraudulent acts, Plaintiffs seek rescission of the contract, restitution of all payments made towards the 2006 Ford F-350, and damages in an amount to be determined at the time of trial.

160.    As a result of FORD's and SUNRISE FORD's fraudulent acts, Plaintiffs also suffered diminution in the value of the Vehicle, out-of-pocket expenses, and damages in the amount of the difference between the value of the Vehicle equipped with the defective engine and the value of the Vehicle if it had been equipped as warranted.

161.    In committing the foregoing acts of fraud pursuant to their respective policies and procedures for selling vehicles equipped with Navistar 6.0-liter engines, FORD and SUNRISE FORD were guilty of oppression, fraud, and/or malice as the terms are defined in Civil Code section 3294.

162.    FORD and SUNRISE FORD have a pattern of committing similar acts of fraud on its consumers.

163.    The foregoing fraudulent and wrongful acts were authorized and ratified by FORD's and SUNRISE FORD's respective officers, directors, and/or managers, including but not limited to Charlie Freese (FORD's Chief Engineer of Diesel Engines), Steve Henderson (FORD Executive), Frank Ligon (FORD's Director of Service Engineering Operations), and Michael Berardi (FORD's CBG Manager). FORD's and SUNRISE FORD's agents or employees also committed the wrongful acts set forth above with the foregoing knowledge, authorization, approval, direction, or ratification of an officer, director, or managing agent of FORD and/or SUNRISE FORD pursuant to implicit or explicit company plans, schemes, or policies regarding the advertising and sale of Ford-brand trucks with 6.0-liter diesel engines. Alternatively, the aforementioned wrongful acts were committed by an officer, director, or managing agent of FORD and/or SUNRISE FORD.

///

-28-

164.     Because of FORD's and SUNRISE FORD's fraudulent acts, an award of punitive damages is appropriate.

## FOURTH CAUSE OF ACTION

### Fraud in the Performance of Warranty Contract – Intentional Misrepresentation

### (Against Ford Motor Company and Does 1-10)

165.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs as though herein fully restated and realleged.

166.     From and after the time of Plaintiffs' purchase of the Vehicle, FORD's express written warranty applied to the Vehicle, including the provisions of FORD's 6.0-liter Powerstroke Diesel Engine Warranty which covered the "engine and engine components against defects in factory-supplied materials or workmanship for five years after the warranty start date or 100,000 miles, whichever occurs first," and which provided "[d]uring this coverage period, authorized Ford dealers will repair, replace, or adjust all parts on your vehicle that are defective in factory-supplied materials or workmanship."

167.     The express warranty, including the 6.0-liter Powerstroke Diesel Engine Warranty, was a separate contract from the sales contract and was made directly between FORD and Plaintiffs, wherein FORD made the material representation of fact to Plaintiffs that FORD, through its authorized dealers, would perform the warranty contract by repairing or otherwise eliminating all defects in the 6.0-liter engine occurring during the warranty period, even if repairing or eliminating the defects required the replacement of the entire engine or the entire vehicle.

168.     As alleged more fully herein, FORD intentionally and fraudulently misrepresented material facts in its 6.0-liter Powerstroke Diesel Engine Warranty by representing that FORD, through its authorized dealers, would repair or otherwise eliminate all defects in the 6.0-liter engine which occurred during the warranty period, because FORD knew before and at the time this warranty was prepared by FORD and presented to Plaintiffs, that the 6.0-liter engine in the Vehicle had serious inherent defects which FORD could not and would not repair or eliminate during the express warranty period.

-29-

169.     At the time FORD provided the express warranty to Plaintiffs, and at all times thereafter, FORD knowingly had no intention to perform its contractual obligation to repair or eliminate the inherent defects of the 6.0-liter engine, of which FORD was aware during the warranty period. Instead, at the time this warranty was prepared and provided to Plaintiffs and at all times thereafter, FORD had an intentional policy and scheme in effect of refusing to authorize "major" repairs or replacements of 6.0-liter engines, even when necessary to repair or eliminate the inherent irreparable defects of the 6.0-liter engine.

170.     Through this policy and scheme, FORD instructed its authorized dealers to only perform limited and knowingly ineffective repairs of the 6.0-liter engine, in order to save FORD millions of dollars in warranty expenses, and in order to leave consumers saddled with these inherently defective vehicles after their warranty periods expired, who would then be required to pay substantial out-of-pocket expenses in attempting to repair the persistent problems caused by the engine's inherent defects.

171.     FORD thereby fraudulently performed its obligations under the express warranty between Plaintiffs and FORD. FORD's fraudulent performance of the warranty contract was carried out, in part, by FORD's fraudulent misrepresentations in the express warranty that FORD would repair or eliminate defects in the 6.0-liter engine, even if doing so required major repairs or replacement of the engine, or replacement of the vehicle. FORD's fraudulent performance of the warranty contract was also carried out, in part, by FORD's refusal to perform major repairs or replacement of the engine or Vehicle when FORD became aware of the presence of these inherent engine defects in the Plaintiffs' Vehicle, which FORD was well aware could not be repaired or eliminated by FORD during the warranty period.

172.     FORD's warranty contract does not provide FORD a license to cheat or defraud Plaintiffs, because the State of California has a legitimate and compelling interest in preserving a business climate free of fraud and deceptive practices. (*See Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 991-993 ("economic loss rule" did not apply to fraud claims arising from intentional misrepresentations of fact related to the performance of a contract; *Las Palmas Associates v. Las Palmas Center Associates* (1991) 235 Cal.App.3d 1220, 1238

1  ("economic loss rule" did not apply to fraud claims arising from intentional misrepresentations

2  concerning the defendant's intent to perform a contract, and stating: "Section 1710, subdivision

3  (4), defines fraud as the making of a promise done without any intention of performing the

4  obligation.  A promise to do something necessarily implies the intention to perform, and where

5  such an intention is absent, there is an implied misrepresentation of fact, which is actionable

6  fraud").)

7                    **FORD'S KNOWLEDGE OF IRREPARABLE DEFECTS**

8                            **OF THE 6.0-LITER ENGINE**

9  173.       As alleged in paragraphs 16 through 32 and 35 through 46 above, FORD's 6.0-liter

10  engines have severe and pervasive design, manufacturing, and quality defects which have been

11  known by FORD since 2002 and continuing thereafter.

12  174.       The defects in the 6.0-liter engine caused FORD to delay the initial launch of the engine

13  from an August 1, 2002 launch date until November 4, 2002.

14  175.       On May 15, 2002, as FORD was planning production of the first 2004 vehicles equipped

15  with the 6.0-liter engine, Charlie Freese, FORD's Chief Engineer of Diesel Engines, identified

16  "multiple high risk items" with the 6.0-liter engine, which would delay the production start,

17  including Injection Control Pressure Sensor (ICP) failures, piston failures, and injector failures

18  which were "of particularly great concern." The problems were so serious that FORD considered

19  extending production of the predecessor 7.3-liter engine, in place of the 6.0-liter engine.

20  176.       On May 29, 2002, with the engine build kick-off just four days away, Freese identified

21  additional "major issues" with the 6.0-liter engine, in addition to the ICP failures, piston failures,

22  and injector failures.  Those "new concerns" included, among others, problems with the head

23  gaskets, turbo charger, the engine idle, and the injector driver module (IDM).

24  177.       By August 23, 2002, FORD still was addressing injector defects causing idle problems,

25  cold start problems, engine stall problems, and injector failures. Although Navistar sent engines

26  with new process injectors to FORD, the durability tests for these engines were scheduled for

27  completion the week of October 9, 2002, less than a month before production was to begin.

28  ///

                                        -31-

                            POWERS v. FORD COMPLAINT

178.     As the November 4, 2002 production date neared, problems with the 6.0-liter engine persisted; FORD was unable to determine their root cause. .FORD decided it could not continue delaying the launch, and instead began producing and selling the 2006 Ford F-350 equipped with the 6.0-liter engine, knowing its engine was defective.

179.     On November 12, 2002, Steven Henderson. a FORD executive, wrote that FORD was "in the middle of the 6.0L launch, and … things are not going well." Although the launch was delayed a week, and the entire Navistar team was working full time. the problems were "not fully resolved yet."

180.     Without remedying the defects, FORD continued to equip subsequent model years of "Super Duty" trucks. beginning with the 2003 models, with the 6.0-liter engine. Regardless of tweaks made to the 6.0-liter engine by FORD during subsequent model years. these same defects to the engine persisted throughout FORD's production and sale of the trucks.

181.     At all relevant times, FORD knew the 2006 Ford F-350 had inherent defects. including defects in its 6.0-liter Navistar engine, that the 2006 Ford F-350 would exhibit defects that would prevent the truck from being merchantable, that the 2006 Ford F-350 would substantially impair the use, value, or safety of the truck, and that the 2006 Ford F-350's defects would not be repaired and eliminated under the applicable warranties.

182.     Throughout FORD's production and sale of the engines, FORD never developed a repair plan in which FORD would comply with the above express warranties by identifying and eliminating the root cause of defects to the 6.0-liter engines. As detailed in the September 7. 2004 memorandum from Frank Ligon, FORD's Director of Service Engineering Operations. FORD did "not have a definitive repair action or production parts to properly address the concern universe." As revealed in an October 2004 email between FORD executives, FORD rejected pilot programs that would have had FORD technical experts assist dealerships with repairs.

183.     Nor did FORD implement a formal recall program that would have required FORD to replace the defective engines. FORD executives had suggested that FORD authorize full and complete repairs of defective engines – essentially throwing the "kitchen sink" at the vehicle in order to help eliminate the need for subsequent repairs. However, in an email on October 8,

-32-

POWERS v. FORD COMPLAINT

1   2004, Michael Berardi, FORD's CBG manager, said "[t]hat particular philosophy is opposite of
2   what we have been _training_ our dealers to do and could lead to a very expensive warranty bill
3   across vehicle lines."

4   184.      FORD instead instructed its authorized dealers to implement a Band-Aid strategy that
5   permitted the dealers to take only limited repair measures, such as cleaning or replacing
6   individual components, which did not properly remedy or resolve the underlying defect. This
7   strategy and scheme reduced FORD's warranty spending by millions of dollars, but did nothing
8   to fix the underlying root causes of the defects in the 6.0-liter engines.

9   185.      In 2006, for example, among FORD's "6.0-liter Top Parts Warranty Actions" were new
10  procedures adopted to address "turbo coking" and "EGR coking" issues that had plagued the
11  engine since its inception. According to a July 2007 email between FORD executives, rather
12  than replace the coked turbo charger or EGR valve, FORD commenced a program in mid-2006
13  of simply "cleaning" the parts in question, thus saving FORD a projected $9 million and $2.5
14  million in warranty spending, respectively, on those two items.

15  186.      These minor, limited measures merely addressed the symptoms. For example, the
16  removal of built up soot effectively concealed the seriousness and extent of the underlying root
17  cause – poor combustion. FORD's own study concluded that the cause was improper injector
18  sealing and associated leaks. Moreover, these measures misled customers, including Plaintiff,
19  to believe that the underlying problem had been fixed, when in fact the symptom likely would
20  reoccur on a later date, possibly when the warranty would have expired, typically forcing the
21  additional expenses to be borne by the customer rather than by the dealer.

22  187.      In FORD's own analysis of the multitude of warranty claims on the troubled 6.0-liter
23  engine, it concluded that the problems associated with the 6.0-liter engine were the result of "the
24  same root cause." As noted above, FORD had attributed the problems to "injector sealing
25  issues." Specifically, leaks between the fuel rail, combustion chamber, and coolant jacket.
26  Despite having this critical knowledge, FORD concealed it from consumers, and continuously
27  treated the symptoms rather than the underlying "root cause" of the problem.

28  ///

-33-

188.     On July 22, 2005, Chris Bolen, FORD's director of North America Powertrain Manufacturing, wrote in a memorandum that the continuous problems with the quality of the 6.0-liter engines were having "disastrous effects on this customer and segment."

189.     In June 2006, FORD engineers discovered that 6.0-liter engines exceeded FORD's own cylinder pressure specifications for "normally" performing engines, prompting one engineer, Mike Frommann, to express concern in a June 2006 email that these specifications might be published or subpoenaed, and could cause FORD to "face a class action." *He therefore recommended that all emails discussing the issue be deleted.*

190.     In addition, FORD has computer systems whereby it monitors warranty claims, communicates with its authorized dealers, and monitors the malfunctions and repair records of all these vehicles. These systems include MORS (Master Owner Relations System), AWS (Analytical Warranty System), and CQIS (Common Quality Indicator System).

191.     Through these systems, FORD has detailed information regarding each time a vehicle is brought into a FORD-authorized dealership for repair, including but not limited to the symptoms that required the unit be brought in for service, the diagnosis of the problem, the repair authorized by FORD, and the work performed on the vehicle.

192.     FORD accumulated a massive database through which it realized that the minor, limited work it was authorizing was inadequate to properly repair these defective engines, and major repairs, including engine replacement, were necessary to address these defects.

193.     FORD continued its practice of only authorizing minor, ineffective repairs of these engine defects. FORD unfairly benefitted by this practice because FORD knew that after the warranty expired, the vehicle owner, rather than FORD, would have to pay for all future repairs.

194.     FORD engineers referred to the failing parts as the "usual suspects." In a presentation dated July 10, 2007, FORD stated, "Causal parts are the usual suspects – Cylinder Head/Head Gasket, Engine Ass'y, EGR Cooler, EGR Valve."

///

///

///

-34-

POWERS v. FORD COMPLAINT

## FORD'S INTENT AND PLAINTIFFS' RELIANCE
## ON FORD'S FALSE REPRESENTATIONS

195.    As alleged in Paragraphs 16 through 32 and 35 through 46 above, from 2002 onward FORD knew of severe and pervasive design, manufacturing, and quality defects inherent in the 6.0-liter engine that could not be repaired or otherwise eliminated by FORD's authorized service dealers during the express warranty period.

196.    FORD nevertheless made the false representations of material fact in FORD's 6.0-liter Powerstroke Diesel Engine Warranty that FORD, through its authorized service dealers, would repair or otherwise eliminate all defects in the 6.0-liter engine that occurred during the express warranty period.

197.    FORD intended that owners of its vehicles, including Plaintiffs, would rely on the foregoing false representations of fact in its written warranty, and that such customers would erroneously believe and expect that FORD would be able to completely repair or otherwise eliminate all defects in the 6.0-liter engine during the express warranty period.

198.    These false representations permitted FORD, as alleged in Paragraphs 35 through 46 above, to engage in an intentional and concerted policy and scheme of authorizing and performing only limited and knowingly ineffective repairs of the 6.0-liter engine during the warranty period, that FORD knew would not and could not eliminate the inherent and persistent defects of the engines. FORD specifically instructed its authorized dealers not to perform major repairs to the engines, or replacement of the entire engines, or replacement of the entire trucks.

199.    FORD's concerted plan and scheme alleged above was intended to save, and indeed did save, millions of dollars in warranty repair expenses to FORD, and was also intended by FORD to leave customers, including Plaintiffs, saddled with inherently defective vehicles after their warranty periods expired. FORD knew and intended that these customers, including Plaintiffs, would be required to pay substantial out-of-pocket expenses for repairs of the inherently defective engines after the expiration of the warranty although FORD, according to its representations in the express warranty, should have repaired or replaced the engines at FORD's expense during the warranty periods.

-35-

POWERS v. FORD COMPLAINT

200.     The foregoing fraudulent misrepresentations of fact were made by FORD at the time of the sale of the Vehicle and continued throughout the warranty period.

201.     FORD knew that the foregoing misrepresentations of fact were false at the times when they were made.

202.     The fraudulent misrepresentations in FORD's 6.0-liter Powerstroke Diesel Engine Warranty, as alleged above, were authorized and ratified by FORD's officers, directors, and/or managers, including but not limited to Charlie Freese (FORD's Chief Engineer of Diesel Engines), Steve Henderson (FORD Executive), Frank Ligon (FORD's Director of Service Engineering Operations), and Michael Berardi (FORD's CBG Manager), who had knowledge of the falsity of these representations of fact but who nevertheless authorized and ratified these representations of fact by FORD.

203.     Plaintiffs, at all material times, actually and reasonably relied on the foregoing false representations of fact made by FORD in the 6.0-liter Powerstroke Diesel Engine Warranty that FORD, through its authorized dealers, would perform the express warranty contract by repairing or otherwise eliminating all defects in the 6.0-liter engine in the Vehicle that occurred during the warranty period.

204.     In reliance on these foregoing false representations of fact, Plaintiffs reasonably believed that repairs being performed on the Vehicle by FORD's authorized dealer during the warranty period were intended to fully repair or eliminate the engine problems, and that the repairs would, in fact, fully repair or eliminate the engine problems being experienced by Plaintiffs.

<div align="center">

**HARM TO PLAINTIFFS AND DAMAGES FROM**

**FORD'S FRAUDULENT PERFORMANCE OF CONTRACT**

</div>

205.     The defective condition of the 6.0-liter diesel engine in the Vehicle was known only to FORD, and Plaintiffs could not have discovered these defects through reasonable diligence, and, in fact, and did not discover these defects until after several years of using the Vehicle.

206.     After purchasing the Vehicle, Plaintiffs began experiencing problems with the 2006 Ford F-350. Plaintiffs took the truck to a FORD-authorized dealership for engine repairs on

<div align="center">

-36-

</div>

1    several separate occasions because of numerous problems with the engine.

2    207.  _  The FORD authorized dealership attempted to repair the foregoing problems with the
3    truck on numerous occasions.  However, these repairs failed to permanently remedy the
4    underlying root defects of the truck's 6.0-liter engine, as alleged above. which persisted
5    throughout the warranty period for the engine and caused persistent engine problems, and which
6    inherent engine defects FORD knew at all material times, as alleged above, would not and could
7    not be fully repaired or eliminated by FORD's authorized dealer during the warranty period for
8    the engine, despite FORD's misrepresentations of fact made in FORD's warranty for the engine
9    provided to Plaintiffs on which Plaintiffs relied that all engine defects would be repaired or
10   eliminated by FORD.

11   208.    These engine problems became so persistent that Plaintiffs were unable to use or rely
12   on the Vehicle.  Failure of the truck in its essential purpose was, and continues to be. extremely
13   frustrating and costly to Plaintiffs.  As a result of the persistent engine problems. Plaintiffs have
14   incurred significant out-of-pocket expenses for repairs and services to the engine, and has also
15   incurred other costs due to the engine problems.

16   209.    Plaintiffs have thereby been left as the owner of a 2006 Ford F-350 with persistent
17   engine defects that have not been and cannot be fully repaired or eliminated, and which FORD
18   knew would not be and could not be repaired or eliminated during the warranty period absent a
19   replacement of the engine and/or a replacement of the truck, which necessary replacement FORD
20   refused to do based on its policy and scheme alleged above.

21   210.    Plaintiffs were therefore harmed as a direct and proximate result of the fraudulent
22   misrepresentations of fact by FORD, and as a result of FORD's fraudulent performance of the
23   express warranty contract in knowingly and intentionally failing to repair or eliminate all defects
24   with the 6.0-liter engine in the Vehicle that occurred during the warranty period.

25   211.    Plaintiffs' reliance on FORD's foregoing fraudulent misrepresentations of fact, and
26   FORD's fraudulent performance of the express warranty contract, was therefore, as alleged
27   above, a substantial factor in causing Plaintiffs harm.

28   ///

-37-

POWERS v. FORD COMPLAINT

212. As a result of FORD's foregoing fraudulent performance of the warranty contract, Plaintiffs seek rescission of the sales contract for the purchase of the Vehicle, restitution of all payments made towards the Vehicle, out-of-pocket expenses, and damages in an amount to be determined at the time of trial.

213. As a result of FORD's foregoing fraudulent performance of the contract, Plaintiffs have also suffered diminution in the value of the Vehicle, and suffered damages in the amount of the difference between the value of the Vehicle actually equipped with the defective engine and the value of the Vehicle if it had been equipped as warranted.

## FORD'S CONDUCT WAS REPREHENSIBLE
## AND WARRANTS AN AWARD OF PUNITIVE DAMAGES

214. As previously alleged herein, FORD exhibited a pattern and practice from 2002 onward of fraudulently misrepresenting in FORD's 6.0-liter Powerstroke Diesel Engine Warranty for its 2006 Ford F-350, including for the Plaintiffs' Vehicle, that FORD, through its authorized dealers, would repair or eliminate all defects in the engine which occurred during the warranty period. FORD made these foregoing false representations of fact in the warranty to its customers, including Plaintiffs, as alleged above, despite the fact that FORD knew at this time and thereafter that the inherent root defects of the 6.0-liter engine would not be repaired or eliminated during the warranty period absent major repairs or a replacement of the engine or the vehicle. FORD made these foregoing false representations of fact in the warranty to its customers, including Plaintiffs, despite the fact that FORD, as alleged above, had instructed its authorized dealers not to perform these major repairs or to replace the defective engines or the vehicles, but instead to only perform limited and ineffective repairs of the engines which FORD knew would not repair or eliminate these inherent defects of the engines. This fraudulent policy and scheme, as alleged above, was intended by FORD to save, and indeed did save FORD, millions of dollars in warranty repair expenses for the 6.0-liter engines of FORD's customers from 2002 onward, including Plaintiffs. This fraudulent policy and scheme, as alleged above, was also intended by FORD to leave its customers, including Plaintiffs, saddled with FORD vehicles equipped with the inherently defective 6.0-liter engines, so these customers, including Plaintiffs, would

-38-

POWERS v. FORD COMPLAINT

1   thereafter be required to pay substantial out-of-pocket expenses for future repairs of the defective

2   engines and vehicles, which FORD, according to the representations made in the warranty

3   provided to FORD's customers, including Plaintiffs, should have rightly repaired or replaced at

4   FORD's expense during the warranty period for these customers, including Plaintiffs.

5   215.     At the same time, FORD earned enormous profits as a result of its failure to repair or

6   eliminate the defects of the 6.0-liter engine in the vehicles of unwary consumers who purchased

7   FORD's vehicles without knowledge of the 6.0-liter engine's serious and irreparable inherent

8   defects, and who relied on FORD's misrepresentations of fact made in the express warranty for

9   the 6.0-liter liter engine that FORD would repair or eliminate all defects of the engine which

10  occurred during the warranty period, including replacement of the engine or the vehicles if

11  necessary to fully repair or eliminate the engine's defects. Indeed, during the period that trucks

12  equipped with the 6.0-liter engine were on the market, this engine provided FORD with high

13  gross profit margins. In addition, because engine replacements cost more than ten times the cost

14  of the lesser and limited ineffective repairs which FORD instructed its authorized dealers to

15  perform, FORD profited enormously by refusing to authorize necessary major engine repairs

16  and/or engine replacements during the warranty period, instead only authorizing less expensive

17  services (such as cleanings or injector replacements), which were not adequate repairs and which

18  would merely serve as a temporary measure until the problems resurfaced and continued after

19  the warranty for the engine expired.

20  216.     FORD's foregoing conduct in employing these unfair, fraudulent, and deceptive

21  practices was malicious, willful, recklessly disregarded the harm to consumers, including

22  Plaintiffs, and was so reprehensible as to warrant the imposition of punitive damages.

23  217.     The foregoing fraudulent and wrongful acts by FORD, as alleged above, were

24  authorized and ratified by FORD's officers, directions, and/or mangers, including but not limited

25  to Charlie Freese (FORD's Chief Engineer of Diesel Engines), Steve Henderson (FORD

26  Executive), Frank Ligon (FORD's Director of Service Engineering Operations), and Michael

27  Berardi (FORD's CBG Manager). FORD's agents or employees also committed the wrongful

28  acts set forth above with the foregoing knowledge, authorization, approval, direction, or

-39-

POWERS v. FORD COMPLAINT

1  ratification of an officer, director, or managing agent of FORD pursuant to an implicit or explicit
2  company plan, scheme, or policy regarding the advertising and sale of Ford-brand trucks with
3  6.0-liter diesel engines. Alternatively, the aforementioned wrongful acts were committed by an
4  officer, director, or managing agent of FORD.

5  218.    In committing the foregoing acts of fraud pursuant to FORD's policies and procedures,
6  FORD was guilty of oppression, fraud, and/or malice as the terms are defined in Civil Code
7  section 3294.Because of FORD's foregoing fraudulent acts directed at Plaintiff and other
8  purchasing consumers of FORD's vehicles with the 6.0 liter engine, and because of the
9  reprehensible nature and wide scale and profitability of FORD's conduct, an award of punitive
10  damages is appropriate in this action.

11

12  ### FIFTH CAUSE OF ACTION

13  ### Song-Beverly Consumer Warranty Act

14  ### (Against All Defendants)

15  219.    Plaintiffs incorporate herein by reference each and every allegation contained in the
16  preceding and succeeding paragraphs as though herein fully restated and re-alleged.

17  220.    Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FORD
18  undertook to preserve or maintain the utility or performance of Plaintiffs' Vehicle or to provide
19  compensation if there was a failure in such utility or performance.

20  221.    The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to
21  warranty and developed other serious defects and nonconformities to warranty.

22  222.    Pursuant to the Song-Beverly Consumer Warranty Act (herein after the "Act") Civil
23  Code sections 1790 *et seq.* the Vehicle constitutes "consumer goods" used primarily for family
24  or household purposes, and Plaintiffs have used the Vehicle primarily for those purposes.

25  223.    Plaintiffs are "buyer" of consumer goods under the Act.

26  224.    Defendant FORD is a "manufacturer" and/or "distributor" under the Act.

27  225.    The foregoing defects and nonconformities to warranty manifested themselves within
28  the applicable express warranty period. The nonconformities substantially impair the use, value

-40-

POWERS v. FORD COMPLAINT

1    and/or safety of the Vehicle.

2    226.    Plaintiffs delivered the Vehicle to an authorized FORD repair facility for repair of the
3    nonconformities.

4    227.    FORD refused and/or failed to conform the Vehicle to, and/or honor, the applicable
5    warranties after a reasonable number of repair attempts.

6    228.    Defendant was unable to conform Plaintiffs' Vehicle to the applicable express after a
7    reasonable number of repair attempts.

8    229.    In order to meet the implied warranty of merchantability, consumer goods must meet
9    each of the following criteria:  (1) pass without objection in the trade under the contract
10    description; (2) are fit for the ordinary purposes for which such goods are used; (3) are adequately
11    contained, packaged, and labeled; and (4) conform to the promises or affirmations of fact made
12    on the container or label.

13    230.    The implied warranty of merchantability has been breached, in that, among other
14    matters, the Vehicle suffered from defects and/or latent defects to its turbo charger systems, fuel
15    injection systems, head gasket, EGR valves, electrical systems, transmission systems, and
16    cooling systems and coolers plugging.

17    231.    Plaintiffs are entitled to justifiably revoke acceptance of the Vehicle under the Song-
18    Beverly Act.

19    232.    Notwithstanding Plaintiff's entitlement, Defendant FORD has failed to either promptly
20    replace the Vehicle or to promptly make restitution in accordance with the Song-Beverly Act.

21    233.    Plaintiffs are entitled to and seek damages and other legal and equitable relief, including,
22    but not limited to, all incidental, consequential, and general damages resulting from FORD's
23    failure to comply with its obligations under the Song-Beverly Act.

24    234.    Plaintiffs are entitled under the Song-Beverly Act to recover as part of the judgment a
25    sum equal to the aggregate amount of costs and expenses, including attorney's fees, reasonably
26    incurred in connection with the commencement and prosecution of this action.

27    235.    Plaintiffs are entitled to, in addition to the amounts recovered, a civil penalty of up to
28    two times the amount of actual damages in that FORD willfully failed to comply with its

1 | responsibilities under the Song-Beverly Act.

2

3 | **SIXTH CAUSE OF ACTION**

4 | **Consumers Legal Remedies Act**

5 | **(Against All Defendants)**

6 | 236.    Plaintiffs incorporate herein by reference each and every allegation contained in the

7 | preceding and succeeding paragraphs as though herein fully restated and realleged.

8 | 237.    The Vehicle is a "good" as defined in Civil Code section 1761, subdivision (a).

9 | 238.    FORD and SUNRISE FORD are subject to the Consumers Legal Remedies Act, Civil

10 | Code section 1750 *et seq.*, as each is a "person" as defined in Civil Code section 1761, subdivision

11 | (c).

12 | 239.    Plaintiffs are "consumers" as defined in Civil Code section 1761, subdivision (d).

13 | 240.    Vehicle Code section 11713, *et seq.* regulates the advertising and sale of motor

14 | vehicles.

15 | 241.    In violation of the foregoing statutes, FORD and SUNRISE FORD have engaged in,

16 | and/or attempted to engage in, the following unfair methods of competition and unfair or deceptive

17 | acts or practices and these methods, acts, or practices were undertaken in a transaction intended to

18 | result or which resulted in the sale of goods or services to a consumer.

19 | 242.    Plaintiffs relied on Ford's and SUNRISE FORD's representations in purchasing the

20 | vehicle.

21 | 243.    The following wrongful acts committed by FORD and SUNRISE FORD violate the

22 | following subdivisions of the CLRA: (5) Representing that goods or services have sponsorship,

23 | approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a

24 | person has a sponsorship, approval, status, affiliation, or connection which he or he does not have;

25 | (7) Representing that goods or services are of a particular standard, quality, or grade, or that goods

26 | are of a particular style or model, if they are of another: (9) Advertising goods or services with intent

27 | not to sell them as advertised; (14) Representing that a transaction confers or involves rights,

28 | remedies, or obligations which it does not have or involve, or which are prohibited by law: (16)

1  Representing that the subject of a transaction has been supplied in accordance with a previous
2  representation when it has not.  (Civ. Code, § 1770, subd. (a).)

3      244.    FORD represented that the 6.0-liter Navistar diesel engine in the Vehicle sold to
4  Plaintiffs was the "longest-lasting diesel uses time-tested cast-iron architecture, for both the block
5  and heads, to withstand the combustion pressures of peak diesel operation. A stiff bedplate enhances
6  rigidity for smooth power.  Electro-Hydraulic Direct Injection (EHDI), 4-valve induction, and
7  electronic engine control optimize horsepower and torque."   At the time FORD made this
8  representation, it was aware of the fact that the defects in the 6.0-liter Navistar diesel engine
9  prevented the engine from operating at optimal capacity, in turn causing the failures of several
10  component parts of the engine.  Those failures in engine parts diminished the towing capacity of the
11  vehicle and necessitated frequent replacements of parts, with no permanent solution to the problems.
12  FORD falsely represented that the vehicle was of a particular standard, quality, or grade in violation
13  of the CLRA.

14      245.    FORD continued to advertise the 6.0-liter Navistar diesel engine as "top in its class,"
15  despite its knowledge of what Ford refers to as the "usual suspects" (irreparable defects) in the
16  vehicle.  FORD sold its defective 6.0-liter Navistar diesel engine with the knowledge that it failed
17  to conform to the specifications for towing capacity and engine quality that it advertised in violation
18  of the CLRA.

19      246.    FORD and SUNRISE FORD represented to Plaintiffs that by entering into the Retail
20  Installment Sales Contract to purchase the vehicle, Plaintiffs were securing the benefit of the
21  warranties given by Ford Motor Company to maintain the utility and performance of the vehicle. or
22  to provide compensation in the event of a failure in utility or performance.  FORD and SUNRISE
23  FORD were aware of their inability to repair the vehicle to conform to the specifications in the
24  warranty.  FORD and SUNRISE FORD represented that the sales transaction conferred an obligation
25  that it did not, in violation of the CLRA.

26      247.    Pursuant to the Consumer Legal Remedies Act, Civil Code section 1750 *et seq.*, on
27  November 6, 2018, Plaintiffs notified FORD by certified mail, return receipt requested, of the
28  alleged violations and demanded that FORD correct, repair, replace, or otherwise rectify the

1    violations.

2         248.    Pursuant to the Consumer Legal Remedies Act, Civil Code section 1750 *et seq.*, on

3    November 16, 2018, Plaintiffs notified SUNRISE FORD by certified mail, return receipt requested,

4    of the alleged violations and demanded that SUNRISE FORD correct, repair, replace, or otherwise

5    rectify the violations.

6         249.    FORD and SUNRISE FORD failed to correct, repair, replace, or otherwise rectify

7    the violations within 30 days of the date the above-referenced notifications.

8         250.    In committing the above wrongful acts, FORD and SUNRISE FORD were guilty of

9    oppression, fraud, or malice, because the acts were perpetrated pursuant to FORD's plan, scheme,

10   or company policy to deceive, defraud, mislead, or take unfair advantage of buyers of Ford-brand

11   trucks with 6.0- liter diesel engines.

12        251.    The foregoing fraudulent and wrongful acts by FORD and SUNRISE FORD, as

13   alleged above, were authorized and ratified by FORD's officers, directors, and/or managers,

14   including but not limited to Charlie Freese (FORD's Chief Engineer of Diesel Engines), Steve

15   Henderson (FORD Executive), Frank Ligon (FORD's Director of Service Engineering Operations),

16   and Michael Berardi (FORD's CBG Manager).  FORD's agents or employees, including SUNRISE

17   FORD, also committed the wrongful acts set forth above with the foregoing knowledge,

18   authorization, approval, direction, or ratification of officers, directors, or managing agents of FORD

19   and SUNRISE FORD pursuant to an implicit or explicit company plan, scheme, or policy regarding

20   the advertising and sale of Ford-brand trucks with 6.0-liter diesel engines.  Alternatively, the

21   aforementioned wrongful acts were committed by an officer, director, or managing agent of FORD.

22        252.    As a direct result of FORD's and SUNRISE FORD's acts and/or omissions, Plaintiffs

23   has been injured as set forth herein.

24        253.    Plaintiffs seek the entry of a preliminary and permanent injunction requiring FORD

25   and SUNRISE FORD to disclose fully, prior to the sale, the inherent engine defects in Ford-brand

26   "Super-Duty" trucks equipped with Navistar 6.0-liter engines and the defects buyers can expect to

27   experience with these trucks and desist from selling these trucks without the foregoing pre-sale

28   disclosure.  Also, Plaintiffs seek an injunction issue to prevent FORD and SUNRISE FORD from

1 | refusing to authorize necessary major engine repairs or replacements during the warranty period in
2 | favor of only authorizing less expensive services such as cleanings or injector replacements which
3 | ultimately fail after the warranty expires.

4 |     254.    Injunctive relief is necessary in this case because (1) the legal remedies are
5 | inadequate and (2) the state has inherent power to halt deceptive conduct. Without injunctive relief,
6 | FORD and SUNRISE FORD will continue to victimize California buyers of trucks with 6.0-liter
7 | engines. The repetition of FORD's and SUNRISE FORD's deceptive sales policies will result in
8 | irreparable harm. Without injunctive relief, FORD and SUNRISE FORD can simply offer damages
9 | to the deceived customers who sue it in order to continue its deceptive practices. Additionally,
10 | injunctive relief is specifically authorized by the Consumers Legal Remedies Act to eradicate unfair
11 | and deceptive business practices.

12 |     255.    The foregoing injunction is sought to protect the public from these predatory
13 | methods, acts, or practices.

14 |     256.    Plaintiffs seek actual damages pursuant to Civil Code section 1780.

15 |     257.    Plaintiffs will amend the complaint to seek punitive damages pursuant to Civil Code
16 | section 1780 if FORD and SUNRISE FORD do not comply with the requirements of the Consumer
17 | Legal Remedies Act.

18 |     258.    An order requiring FORD and SUNRISE FORD to notify all consumers who were
19 | victimized is also sought, which would require FORD and SUNRISE FORD to inform consumers
20 | of its deceptive practices.

21 |     259.    Plaintiffs should be awarded costs, expenses, and attorney fees reasonably incurred
22 | in connection with the award of injunctive relief.

23 |     260.    On behalf of Plaintiffs alone, equitable relief in the form of restitution/rescission is
24 | sought; plus costs, expenses, and attorney fees reasonably incurred.

25 | ///
26 | ///
27 | ///
28 | ///

-45-

POWERS v. FORD COMPLAINT

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants, as follows:

1.    For general, special and actual damages according to proof at trial;

2.    For rescission of the purchase contract and restitution of all monies expended;

3.    For diminution in value;

4.    For incidental and consequential damages according to proof at trial;

5.    For civil penalty in the amount of two times Plaintiff's actual damages;

6.    For prejudgment interest at the legal rate;

7.    For injunctive and equitable relief;

8.    For punitive damages pursuant to Civil Code section 3294;

9.    For reasonable attorney's fees and costs of suit; and

10.    For such other and further relief as the Court deems just and proper under the circumstances.

Dated:  11/26/18                              **KNIGHT LAW GROUP, LLP**


Steve Mikhov (SBN 224676)
AMY MORSE (SBN 290502)
Attorneys for Plaintiffs,
JACQUES POWERS on behalf of
BIG ISLAND CLIMBERS ON THE
MAINLAND, INC. and
ANGEL POWERS on behalf of
BIG ISLAND CLIMBERS ON THE
MAINLAND, INC.


Plaintiffs, JACQUES POWERS on behalf of BIG ISLAND CLIMBERS ON THE MAINLAND, INC., and ANGEL POWERS on behalf of BIG ISLAND CLIMBERS ON THE MAINLAND, INC., hereby demands trial by jury in this action

-46-

POWERS v. FORD COMPLAINT

EXHIBIT 1

## RETAIL INSTALLMENT SALE CONTRACT ~ SIMPLE FINANCE CHARGE

Dealer Number 71G152    Contract Number 224446    R.O.S. Number 38276560    Stock Number V32790
DATE: 09/30/2008    CONTROL # V32790    Salesperson: LEO GONZALEZ

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Creditor-Seller (Name and Address) |
|---|---|---|
| BIG ISLAND CLIMBERS ON THE MAINLAND INC.<br>PO BOX 938<br>RIMFOREST  CA 92378<br>SAN BERNARDINO | | SUNRISE FORD<br>16005 VALLEY BLVD<br>FONTANA, CA  92335 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New Used | Year | Make and Model | Odometer | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| USED | 2006 | FORD F350 CREW CAB | 29629 | 1FTWW31P36EB31215 | ☒ personal, family or household<br>☐ business or commercial |

### FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $ 31231.36 |
|---|---|---|---|---|
| 0.00 % | $ 0.00(e) | $ N/A | $ 13531.36 | $ 31231.36 is $ 31231.36(e) |

(e) means an estimate

**YOUR PAYMENT SCHEDULE WILL BE:**

| Number of Payments: | Amount of Payments: | When Payments Are Due: |
|---|---|---|
| One Payment of | 13,531.36 | 10/14/2008 |
| One Payment of | N/A | N/A |
| 1        Payments | N/A | Monthly, Beginning 09/30/2008 |
| N/A     Payments | N/A | Monthly, Beginning N/A |
| One Final Payment | N/A | N/A |

Late Charge. If payment is not received in full within 10 days after it is due, you will pay a late charge of 5% on the part of the payment that is late.
Prepayment. If you pay off all your debt early, you may be charged a minimum finance charge.
Security Interest. You are giving a security interest in the vehicle being purchased.
Additional Information: See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date, minimum finance charges, and security interest.

### ITEMIZATION OF THE AMOUNT FINANCED (Seller may keep part of the amounts paid to others.)

| | | |
|---|---|---|
| A. Cash Price of Motor Vehicle and Accessories | $ 28916.10 (A) | |
| 1. Cash Price Vehicle | $ 28916.10 | |
| 2. Cash Price Accessories | $ N/A | |
| 3. Other (Nontaxable) | | |
| Describe  N/A | $ N/A | |
| Describe  N/A | $ N/A | |
| B. Document Preparation Fee (not a governmental fee) | $ 55.00 (B) | |
| C. Smog Fee Paid to Seller | $ N/A (C) | |
| D. (Optional) Theft Deterrent Device (to whom paid) | $ N/A (D) | |
| E. (Optional) Theft Deterrent Device (to whom paid) | $ N/A (E) | |
| F. (Optional) Theft Deterrent Device (to whom paid) | $ N/A (F) | |
| G. (Optional) Surface Protection Product (to whom paid) | $ N/A (G) | |
| H. (Optional) Surface Protection Product (to whom paid) | $ N/A (H) | |
| I. Sales Tax (on taxable items in A through H) | $ 2245.26 (I) | |
| J. Optional DMV Electronic Filing Fee | $ N/A (J) | |
| K. (Optional) Service Contract (to whom paid) N/A | $ N/A (K) | |
| L. (Optional) Service Contract (to whom paid) N/A | $ N/A (L) | |
| M. (Optional) Service Contract (to whom paid) N/A | $ N/A (M) | |
| N. (Optional) Service Contract (to whom paid) N/A | $ N/A (N) | |
| O. (Optional) Service Contract (to whom paid) N/A | $ N/A (O) | |
| P. Prior Credit or Lease Balance paid by Seller to | | |
| N/A | $ N/A (P) | |
| (see downpayment and trade-in calculation) | | |
| Q. (Optional) Gap Contract (to whom paid) N/A | $ N/A (Q) | |

### STATEMENT OF INSURANCE

NOTICE. No person is required as a condition of financing the purchase of a motor vehicle to purchase or negotiate any insurance through a particular insurance company, agent or broker. You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.

**Vehicle Insurance**

| | | Term | Premium |
|---|---|---|---|
| $ N/A | Ded. Comp., Fire & Theft | N/A Mos. | $ N/A |
| $ N/A | Ded. Collision | N/A Mos. | $ N/A |
| Bodily Injury | $ N/A Limits | N/A Mos. | $ N/A |
| Property Damage | $ N/A Limits | N/A Mos. | $ N/A |
| Medical | N/A | N/A Mos. | $ N/A |
| | N/A | N/A Mos. | $ N/A |

Total Vehicle Insurance Premiums    $ N/A(e)

UNLESS A CHARGE IS INCLUDED IN THIS AGREEMENT FOR PUBLIC LIABILITY OR PROPERTY DAMAGE INSURANCE, PAYMENT FOR SUCH COVERAGE IS NOT PROVIDED BY THIS AGREEMENT.

You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit.

Buyer X _____
Co-Buyer X _____
Seller X _____

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

### Application for Optional Credit Insurance

☐ Credit Life:  ☐ Buyer  ☐ Co-Buyer  ☐ Both
☐ Credit Disability (Buyer Only)

| | Term | Exp. | Premium |
|---|---|---|---|
| Credit Life | N/A Mos. | | $ N/A |
| Credit Disability | N/A Mos. | | $ N/A |

Total Credit Insurance Premiums    $ N/A (b)

Insurance Company Name
FORD LIFE INSU
Home Office Address    P.O. BOX 1799
DEARBORN, MI 48121

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown above.

You are applying for the credit insurance marked above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday. (2) You are eligible for disability insurance only if you are working for wages or

| | | |
|---|---|---|
| H. (Optional) Surface Protection Product (to whom paid) | $ | N/A (H) |
| I. Sales Tax (on taxable items in A through H) | $ | 2245.26 (I) |
| J. Optional DMV Electronic Filing Fee | $ | N/A (J) |
| K. (Optional) Service Contract (to whom paid) N/A | $ | N/A (K) |
| L. (Optional) Service Contract (to whom paid) N/A | $ | N/A (L) |
| M. (Optional) Service Contract (to whom paid) N/A | $ | N/A (M) |
| N. (Optional) Service Contract (to whom paid) N/A | $ | N/A (N) |
| O. (Optional) Service Contract (to whom paid) N/A | $ | N/A (O) |
| P. Prior Credit or Lease Balance paid by Seller to N/A | | |
| (see downpayment and trade-in calculation) | $ | N/A (P) |
| Q. (Optional) Gap Contract (to whom paid) N/A | $ | N/A (Q) |
| R. (Optional) Used Vehicle Contract Cancellation Option Agreement | $ | N/A (R) |
| S. Other (to whom paid) N/A | $ | N/A (S) |
| For N/A | | |
| Total Cash Price (A through S) | $ 31216.36 | (1) |

2. **Amounts Paid to Public Officials**

| | | |
|---|---|---|
| A. License Fees | $ | 15.00 (A) |
| B. Registration/Transfer/Titling Fees | $ | N/A (B) |
| C. California Tire Fees | $ | N/A (C) |
| D. Other | $ | N/A (D) |
| Total Official Fees (A through D) | $ | 5.00 (2) |

3. **Amount Paid to Insurance Companies**
(Total premiums from Statement of Insurance column a+b)

| | | |
|---|---|---|
| | $ | N/A (3) |
| 4. Smog Certification or ☐ Exemption Fee Paid to State | $ | N/A (4) |
| 5. Subtotal (1 through 4) | $ | (5) |
| 6. Total Downpayment | | |
| A. Agreed Trade-in Value N/A Model N/A | $ N/A | (A) |
| VIN N/A Odom N/A | | |
| B. Less Prior Credit or Lease Balance | $ | N/A (B) |
| C. Net Trade-in (A less B) (indicate if a negative number) | $ | N/A (C) |
| D. Deferred Downpayment | $ | N/A (D) |
| E. Manufacturer's Rebate | $ | N/A (E) |
| F. Other N/A | $ | N/A (F) |
| G. Cash | $ 17700.00 | (G) |
| Total Downpayment (C through G) | $ 31233.36 | (6) |
(If negative, enter zero on line 6 and enter the amount less than zero as a positive number on line 1P above)

| | | |
|---|---|---|
| 7. Amount Financed (5 less 6) | $ | N/A (7) |

Estimated

SELLER ASSISTED LOAN
BUYER MAY BE REQUIRED TO PLEDGE SECURITY FOR THE LOAN, AND WILL BE OBLIGATED FOR THE INSTALLMENT PAYMENTS ON BOTH THIS RETAIL INSTALLMENT SALE CONTRACT AND THE LOAN.

Proceeds of Loan From: N/A
Amount $ N/A  Finance Charge $ N/A
Total $ N/A  Payable in
installments of $ N/A  $ N/A
from this Loan is shown in item 6D.

**AUTO BROKER FEE DISCLOSURE**
If this contract reflects the retail sale of a new motor vehicle, the sale is not subject to a fee received by an autobroker from us unless the following box is checked:

☐ Name of autobroker receiving fee, if applicable:

---

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown above.

You are applying for the credit insurance marked above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday. (2) You are eligible for disability insurance only if you are working for wages or profit 30 hours a week or more on the Effective Date. (3) Only the Primary Buyer is eligible for disability insurance. DISABILITY INSURANCE MAY NOT COVER CONDITIONS FOR WHICH YOU HAVE SEEN A DOCTOR OR CHIROPRACTOR IN THE LAST 6 MONTHS (Refer to "Total Disabilities Not Covered" in your policy for details).
You want to buy the credit insurance.

Date   Buyer Signature                   Age

Date   Co-Buyer Signature

**OPTIONAL GAP CONTRACT** A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in item 1Q of the itemization of Amount Financed. See your gap contract for details on the terms and conditions it provides. It is a part of this contract.

Term N/A Mos.   N/A   Name of Gap Contract

I want to buy a gap contract.

Buyer Signs X

**OPTIONAL SERVICE CONTRACT(S)** You want to purchase the service contract(s) written with the following company(ies) for the term(s) shown below for the charge(s) shown in item 1K, 1L, 1M, 1N, and/or 1O.

| | | | | |
|---|---|---|---|---|
| 1K Company N/A | | | | |
| Term N/A Mos. or N/A Miles | | | | |
| 1L Company N/A | | | | |
| Term N/A Mos. or N/A Miles | | | | |
| 1M Company N/A | | | | |
| Term N/A Mos. or N/A Miles | | | | |
| 1N Company N/A | | | | |
| Term N/A Mos. or N/A Miles | | | | |
| 1O Company N/A | | | | |
| Term N/A Mos. or N/A Miles | | | | |

Buyer X

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding.

Buyer Signs X

Co-Buyer Signs X

---

**SELLER'S RIGHT TO CANCEL** If Buyer and Co-Buyer sign here, the provisions of the Seller's Right to Cancel section on the back will apply. Seller has the right to cancel if Seller is unable to assign this contract to a financial institution will apply.

X
Buyer

X
Co-Buyer

---

**OPTION:** ☐ You pay no finance charge if the Amount Financed, item 7, is paid in full on or before N/A , Year     SELLER'S INITIALS

---

THE MINIMUM PUBLIC LIABILITY INSURANCE LIMITS PROVIDED IN LAW MUST BE MET BY EVERY PERSON WHO PURCHASES A VEHICLE. IF YOU ARE UNSURE WHETHER OR NOT YOUR CURRENT INSURANCE POLICY WILL COVER YOUR NEWLY ACQUIRED VEHICLE IN THE EVENT OF AN ACCIDENT, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
WARNING:
YOUR PRESENT POLICY MAY NOT COVER COLLISION DAMAGE OR MAY NOT PROVIDE FOR FULL REPLACEMENT COSTS FOR THE VEHICLE BEING PURCHASED. IF YOU DO NOT HAVE FULL COVERAGE, SUPPLEMENTAL COVERAGE FOR COLLISION DAMAGE MAY BE AVAILABLE TO YOU THROUGH YOUR INSURANCE AGENT OR THROUGH THE SELLING DEALER. HOWEVER, UNLESS OTHERWISE SPECIFIED, THE COVERAGE YOU OBTAIN THROUGH THE DEALER PROTECTS ONLY THE DEALER, USUALLY UP TO THE AMOUNT OF THE UNPAID BALANCE REMAINING AFTER THE VEHICLE HAS BEEN REPOSSESSED AND SOLD.
FOR ADVICE ON FULL COVERAGE THAT WILL PROTECT YOU IN THE EVENT OF LOSS OR DAMAGE TO YOUR VEHICLE, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
THE BUYER SHALL SIGN TO ACKNOWLEDGE THAT HE/SHE UNDERSTANDS THESE PUBLIC LIABILITY TERMS AND CONDITIONS.

X S X                          X

| Total $ N/A Payable in Installments of $ N/A $ N/A from this Loan is Shown in Item 6D. | ☐ Name of autobroker receiving fee, if applicable: N/A | Term N/A Months N/A Miles Buyer X |

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding.

Buyer Signs X _____
Co-Buyer Signs X _____

**SELLER'S RIGHT TO CANCEL.** If Buyer and Co-Buyer sign here, the provisions of the Seller's Right to Cancel section on the back giving the Seller the right to cancel if Seller is unable to assign this contract to a financial institution will apply.

X _____ Buyer     X _____ Co-Buyer

**OPTION:** ☐ You pay no finance charge if the Amount Financed, item 7, is paid in full on or before ___ N/A ___, ___ Year, ___ SELLER'S INITIALS ___

THE MINIMUM PUBLIC LIABILITY INSURANCE LIMITS PROVIDED IN LAW MUST BE MET BY EVERY PERSON WHO PURCHASES A VEHICLE. IF YOU ARE UNSURE WHETHER OR NOT YOUR CURRENT INSURANCE POLICY WILL COVER YOUR NEWLY ACQUIRED VEHICLE IN THE EVENT OF AN ACCIDENT, YOU SHOULD CONTACT YOUR INSURANCE AGENT.

WARNING:
YOUR PRESENT POLICY MAY NOT COVER COLLISION DAMAGE OR MAY NOT PROVIDE FOR FULL REPLACEMENT COSTS FOR THE VEHICLE BEING PURCHASED. IF YOU DO NOT HAVE FULL COVERAGE, SUPPLEMENTAL COVERAGE FOR COLLISION DAMAGE MAY BE AVAILABLE TO YOU THROUGH YOUR INSURANCE AGENT OR THROUGH THE SELLING DEALER. HOWEVER, UNLESS OTHERWISE SPECIFIED, THE COVERAGE YOU OBTAIN THROUGH THE DEALER PROTECTS ONLY THE DEALER, USUALLY UP TO THE AMOUNT OF THE UNPAID BALANCE REMAINING AFTER THE VEHICLE HAS BEEN REPOSSESSED AND SOLD.

FOR ADVICE ON FULL COVERAGE THAT WILL PROTECT YOU IN THE EVENT OF LOSS OR DAMAGE TO YOUR VEHICLE, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
THE BUYER SHALL SIGN TO ACKNOWLEDGE THAT HE/SHE UNDERSTANDS THESE PUBLIC LIABILITY TERMS AND CONDITIONS.

S/S X _____     X _____

Representations of Buyer. Seller has relied on the truth and accuracy of the information provided by you in connection with the Trade-In Vehicle. You represent that you have given a true payoff amount on the vehicle traded in. If the payoff amount is more than the amount shown above in item 6B as "Prior Credit or Lease Balance," you must pay Seller the excess on demand. If the payoff amount is less than the amount shown above in item 6B as "Prior Credit or Lease Balance," Seller will refund the difference to you.

Buyer X _____     Co-Buyer X _____

Notice to buyer: (1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled in copy of this agreement. (3) You can prepay the full amount due under this agreement at any time. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.

If you have a complaint concerning this sale, you should try to resolve it with the seller.
Complaints concerning unfair or deceptive practices or methods by the seller may be referred to the city attorney, the district attorney, or an Investigator for the Department of Motor Vehicles, or any combination thereof.
After this contract is signed, the seller may not change the financing or payment terms unless you agree in writing to the change. You do not have to agree to any change, and it is an unfair or deceptive practice for the seller to make a unilateral change.

Buyer Signature X _____     Co-Buyer Signature X _____

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

**THERE IS NO COOLING-OFF PERIOD UNLESS YOU OBTAIN A CONTRACT CANCELLATION OPTION**
California law does not provide for a "cooling-off" or other cancellation period for vehicle sales. Therefore, you cannot later cancel this contract simply because you change your mind, decide the vehicle costs too much, or wish you had acquired a different vehicle. After you sign below, you may only cancel this contract with the agreement of the seller or for legal cause, such as fraud. However, California law does require a seller to offer a 2-day contract cancellation option on used vehicles with a purchase price of less than $40,000, subject to certain statutory conditions. This contract cancellation option requirement does not apply to the sale of a recreational vehicle, a motorcycle, or an off-highway motor vehicle subject to identification under California law. See the vehicle contract cancellation option agreement for details.

YOU AGREE TO THE TERMS OF THIS CONTRACT. YOU CONFIRM THAT BEFORE YOU SIGNED THIS CONTRACT, WE GAVE IT TO YOU, AND YOU WERE FREE TO TAKE IT AND REVIEW IT. YOU ACKNOWLEDGE THAT YOU HAVE READ BOTH SIDES OF THIS CONTRACT, INCLUDING THE ARBITRATION CLAUSE ON THE REVERSE SIDE, BEFORE SIGNING BELOW. YOU CONFIRM THAT YOU RECEIVED A COMPLETELY FILLED-IN COPY WHEN YOU SIGNED IT.

Buyer Signature X _____  Date 09/30/08  Co-Buyer Signature X _____  Date _____

Co-Buyers and Other Owners — A Co-Buyer is a person also responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other Owner Signature X _____     Address _____

GUARANTY: To induce us to sell the vehicle to Buyer, each person who signs as a Guarantor individually guarantees the payment of this contract. If Buyer fails to pay any money owing on this contract, each Guarantor must pay it when asked. Each Guarantor will be liable for the total amount owing even if other persons also sign as Guarantor, and even if Buyer has a complete defense to Guarantor's demand for reimbursement. Each Guarantor agrees to be liable even if we do one or more of the following: (1) give the Buyer more time to pay one or more payments; (2) give a full or partial release to any other Guarantor; (3) release any security; (4) except fees from the Buyer than the total amount owing; or (5) otherwise reach a settlement relating to this contract or extend the contract. Each Guarantor acknowledges receipt of a completed copy of this contract and guaranty at the time of signing.
Guarantor waives notice of acceptance of this Guaranty, notice of the Buyer's non-payment, non-performance, and default; and notice of the amount owing at any time, and of any demands upon the Buyer.

Guarantor X N/A _____  Date N/A  Guarantor X N/A _____  Date N/A
Address N/A _____  Address N/A _____

Seller Signs SUNRISE FORD  Date 09/30/08  By X _____  Title MANAGER

LAW FORM 553-CA-ARB (REV. 5/08) U.S. PATENT NO. D461,782
©2008 The Reynolds and Reynolds Company TO ORDER: Call toll free 1-800-344-0794, fax 1-800-531-9055
LAW FORM MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO CONTENT OR FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

CaN00853 Home Ph # (909) 337-6485-- Work Ph # ( ) -

CUSTOMER / TRUTH IN LENDING COPY

OTHER IMPORTANT AGREEMENTS

**1.   FINANCE CHARGE AND PAYMENTS**

a.   How we will figure Finance Charge. We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed. Creditor-Seller may receive part of the Finance Charge.

b.   How we will apply payments. We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.

c.   How late payments or early payments change what you must pay. We based the Finance Charge, Total of Payments, and Total Sale Price shown on the front on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

d.   You may prepay. You may prepay all or part of the unpaid part of the Amount Financed at any time. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment. As of the date of your payment, if the minimum finance charge is greater than the earned Finance Charge, you may be charged the difference; the minimum finance charge is as follows: (1) $25 if the original Amount Financed does not exceed $1,000, (2) $50 if the original Amount Financed is more than $1,000 but not more than $2,000, or (3) $75 if the original Amount Financed is more than $2,000.

**2.   YOUR OTHER PROMISES TO US**

a.   If the vehicle is damaged, destroyed, or missing. You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.

> **GAP LIABILITY NOTICE**
> In the event of theft or damage to your vehicle that results in a total loss, there may be a gap between the amount you owe under this contract and the proceeds of your insurance settlement and deductible. THIS CONTRACT PROVIDES THAT YOU ARE LIABLE FOR THE GAP AMOUNT. An optional gap contract (debt cancellation contract) for coverage of the gap amount may be offered for an additional charge.

b.   Using the vehicle. You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

c.   Security Interest.
You give us a security interest in:
      The vehicle and all parts or goods installed on it;
      All money or goods received (proceeds) for the vehicle;
      All insurance, maintenance, service, or other contracts we finance for you; and
      All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.
This secures payment of all you owe on this contract. It also secures your other agreements in this contract. It also allows. You will make sure the title shows our security interest (lien) in the vehicle.

d.   Insurance you must have on the vehicle.
You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium for the insurance and a finance charge equal to the Annual Percentage Rate shown on the

f.   We will sell the vehicle if you do not get it back. If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.
We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at the Annual Percentage Rate shown on the face of this contract, not to exceed the highest rate permitted by law, until you pay.

g.   What we may do about optional insurance, maintenance service, or other contracts. This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we demand that you pay all you owe at once or we repossess the vehicle, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

**4.   WARRANTIES SELLER DISCLAIMS**

If you do not get a written warranty, and the Seller does not enter into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.
This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide. If the Seller has sold you a certified used vehicle, the warranty of merchantability is not disclaimed.

**5.   Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.
**Spanish Translation:** Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

**6.   Applicable Law.**
Federal law and California law apply to this contract. If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.

**7.   Warranties of Buyer.** You promise you have given true and correct information in your application for credit, and you have no knowledge that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this contract. Upon request, you will provide us with documents and other information necessary to verify any item contained in your credit application.

You waive the provisions of Calif. Vehicle Code Section 1808.21 and authorize the California Department of Motor Vehicles to furnish your residence address to us.

**CREDIT DISABILITY INSURANCE NOTICE**
**CLAIM PROCEDURE**

If you become disabled, you must tell us right away. (You are advised to send this information to the same address to which you are normally required to send your payments, unless a different address or telephone number is given to you in writing by us as the location where we would like to be notified.) We will tell you where to get claim forms. You must send in the completed form to the insurance company as soon as possible and tell us as soon as you do.

You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium for the insurance and a finance charge equal to the Annual Percentage Rate shown on the front of this contract or, at our option, the highest rate the law permits. If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

c. **What happens to returned insurance, maintenance, service, or other contract charges.** If we get a refund of insurance, maintenance, service, or other contract charges, you agree that we may subtract the refund from what you owe.

3. **IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES.**

a. **You may owe late charges.** You will pay a late charge on each late payment as shown on the front. Acceptance of a late payment or late charge does not excuse your late payment or mean that your later payments need not be on time.

b. **You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract at once, subject to any right the law gives you to reinstate this contract.
Default means:
• You do not pay any payment on time;
• You give false, incomplete, or misleading information on a credit application;
• You start a proceeding in bankruptcy or one is started against you or your property;
• The vehicle is lost, damaged, or destroyed; or
• You break any agreements in this contract.
The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.

c. **You may have to pay collection costs.** You will pay our reasonable costs to collect what you owe, including attorney fees, court costs, collection agency fees, and fees paid for other reasonable collection efforts. You agree to pay a charge not to exceed $15 if any check you give to us is dishonored.

d. **We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

e. **How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back (redeem). You may redeem the vehicle by paying all you owe, or you may have the right to reinstate this contract and redeem the vehicle by paying past due payments and any late charges, providing proof of insurance, and/or taking other action to cure the default. We will provide you all notices required by law to tell you when and how much to pay, and/or what action you must take to redeem the vehicle.

---

authorize the California Department of Motor Vehicles to furnish your residence address to us.

**CREDIT DISABILITY INSURANCE NOTICE**
**CLAIM PROCEDURE**

If you become disabled, you must tell us right away. (You are advised to send this information to the same address to which you are normally required to send your payments, unless a different address or telephone number is given to you in writing by us as the location where we would like to be notified.) We will tell you where to get claim forms. You must send in the completed form to the insurance company as soon as possible and tell us as soon as you do.
If your disability insurance covers all of your missed payment(s), WE CANNOT TRY TO COLLECT WHAT YOU OWE OR FORECLOSE UPON OR REPOSSESS ANY COLLATERAL UNTIL THREE CALENDAR MONTHS AFTER your first missed payment is due or until the insurance company pays or rejects your claim, whichever comes first. We can, however, try to collect, foreclose, or repossess if you have any money due and owing to us or are otherwise in default when your disability claim is made if it is a senior _____ or lien holder is foreclosing.
If the insurance company pays the claim within the three calendar months, we must accept the money as though you paid on time. If the insurance company rejects the claim within the three calendar months or accepts the claim within the three calendar months on a partial disability and pays less than for a total disability, you will have 35 days from the date of the rejection or the acceptance of the partial between the past due payments and payments, or the difference pays for the partial disability, plus late charges. The insurance company, we will tell you how much you owe. After that time, we can contact us and to collect or foreclose or repossess any collateral you may have given. If the insurance company accepts your claim but requires that you send in additional forms to remain eligible for continued payments, you should send in these completed additional forms no later than required. If you do not send in these forms in time, the company may stop paying, and we will be able to take action to collect or foreclose or repossess any collateral you may have given.

---

| **Seller's Right to Cancel** |
|---|
| a. Seller agrees to deliver the vehicle to you on the date this contract is signed by Seller and you. You understand that it may take a few days for Seller to verify your credit and assign the contract. You agree that if Seller is unable to assign the contract to any one of the financial institutions with whom Seller regularly does business under an assignment acceptable to Seller, Seller may cancel the contract. |
| b. Seller shall give you written notice (or in any other manner in which actual notice is given to you) within 10 days of the date this contract is signed if Seller elects to cancel. Upon receipt of such notice, you must immediately return the vehicle to Seller in the same condition as when sold, reasonable wear and tear excepted. Seller must give back to you all consideration received by Seller, including any trade-in vehicle. \_\_\_ |
| c. If you do not immediately return the vehicle, you shall be liable for all expenses incurred by Seller in taking the vehicle from you, including reasonable attorney's fees. |
| d. While the vehicle is in your possession, all terms of the contract, including those relating to use of the vehicle and insurance for the vehicle, shall be in full force and you shall assume all risk of loss or damage to the vehicle. You must pay all reasonable costs for repair of any damage to the vehicle until the vehicle is returned to Seller. |

---

**ARBITRATION CLAUSE**
**PLEASE REVIEW · IMPORTANT · AFFECTS YOUR LEGAL RIGHTS**

1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.
2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.
3. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do

d. **We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense; if you do not ask for these items back, we may dispose of them as the law allows.

e. **How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back (redeem). You may redeem the vehicle by paying all you owe, or you may have the right to reinstate this contract and redeem the vehicle by paying past-due payments and any late charges, providing proof of insurance, and/or taking other action to cure the default. We will provide you all notices required by law to tell you when and how much to pay and/or what action you must take to redeem the vehicle.

is signed if Seller elects to cancel. Upon receipt of such notice, you must immediately return the vehicle to Seller in the same condition as when sold, reasonable wear and tear excepted. Seller must give back to you all consideration received by Seller, including any trade-in vehicle.

c. If you do not immediately return the vehicle, you shall be liable for all expenses incurred by Seller in taking the vehicle from you, including reasonable attorney's fees.

d. While the vehicle is in your possession, all terms of the contract, including those relating to use of the vehicle and insurance for the vehicle, shall be in full force and you shall assume all risk of loss or damage to the vehicle. You must pay all reasonable costs for repair of any damage to the vehicle until the vehicle is returned to Seller.

---

## ARBITRATION CLAUSE
### PLEASE REVIEW - IMPORTANT - AFFECTS YOUR LEGAL RIGHTS

1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.
2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.
3. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Clause, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. If federal law provides that a claim or dispute is not subject to binding arbitration, this Arbitration Clause shall not apply to such claim or dispute. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. You may choose one of the following arbitration organizations and its applicable rules: the National Arbitration Forum, Box 50191, Minneapolis, MN 55405-0191 (www.arb-forum.com), the American Arbitration Association, 335 Madison Ave., Floor 10, New York, NY  10017-4605 (www.adr.org), or any other organization that you may choose subject to our approval. You may get a copy of the rules of these organizations by contacting the arbitration organization or visiting its website.

Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law in making an award. The arbitration hearing shall be conducted in the federal district in which you reside unless the Creditor-Seller is a party to the claim or dispute, in which case the hearing will be held in the federal district where this contract was executed. We will advance your filing, administration, service or case management fee and your arbitrator or hearing fee all up to a maximum of $2500, which may be reimbursed by decision of the arbitrator at the arbitrator's discretion. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. If the chosen arbitration organization's rules conflict with this Arbitration Clause, then the provisions of this Arbitration Clause shall control. The arbitrator's award shall be final and binding on all parties, except that in the event the arbitrator's award for a party is $0 or against a party is in excess of $100,000, or includes an award of injunctive relief against a party, that party may request a new arbitration under the rules of the arbitration organization by a three-arbitrator panel. The appealing party requesting new arbitration shall be responsible for the filing fee and other arbitration costs subject to a final determination by the arbitrators of a fair apportionment of costs.  Any arbitration under this Arbitration Clause shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration.

You and we retain any rights to self-help remedies, such as repossession. You and we retain the right to seek remedies in small claims court for disputes or claims within that court's jurisdiction, unless such action is transferred, removed or appealed to a different court. Neither you nor we waive the right to arbitrate by using self-help remedies or filing suit. Any court having jurisdiction may enter judgment on the arbitrator's award. This Arbitration Clause shall survive any termination, payoff or transfer of this contract. If any part of this Arbitration Clause, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable. If a waiver of class action rights is deemed or found to be unenforceable for any reason in a case in which class action allegations have been made, the remainder of this Arbitration Clause shall be unenforceable.

---

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only if the "personal, family or household" box in the "Primary Use for Which Purchased" section of this contract is checked. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

| | (Assignee) at (address) |
|---|---|
| Seller assigns its interest in this contract to | |
| | under the terms of Seller's agreement(s) with Assignee. |
| ☐ Assigned with recourse        ☐ Assigned without recourse | ☐ Assigned with limited recourse |
| Seller | By | Title |

Form No. 553-CA-ARB 5/08

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN BERNARDINO


San Bernardino District - Civil
247 West Third Street

San Bernardino, CA. 924150210
-----------------------------------------------------------------------
-----------------------------------------------------------------------
                                    CASE NO: CIVDS1830756
  KNIGHT LAW GROUP, LLP
  10250 CONSTELLATION BLVD.
  SUITE 2500
  LOS ANGELES CA 90067
                            NOTICE OF TRIAL SETTING CONFERENCE


IN RE: POWERS ET AL-V-FORD

THIS CASE HAS BEEN ASSIGNED TO: BRIAN S MCCARVILLE IN DEPARTMENT S30
FOR ALL PURPOSES.

Notice is hereby given that the above-entitled case has been set for
Trial Setting Conference at the court located at 247 West Third Street
San Bernardino, CA  92415-0210.

        HEARING DATE: 05/24/19 at  8:30 in Dept. S30


DATE: 11/27/18  Nancy Eberhardt, Court Executive Officer
                                     By: LEANNE LANDEROS
-----------------------------------------------------------------------
-----------------------------------------------------------------------
                    CERTIFICATE OF SERVICE

I am a Deputy Clerk of the Superior Court for the County of San
Bernardino at the above listed address. I am not a party to this
action and on the date and place shown below, I served a copy of the
above listed notice:
( ) Enclosed in a sealed envelope mailed to the interested party
addressed above, for collection and mailing this date, following
standard Court practices.
( ) Enclosed in a sealed envelope, first class postage prepaid in the
U.S. mail at the location shown above, mailed to the interested party
and addressed as shown above, or as shown on the attached listing.
( ) A copy of this notice was given to the filing party at the counter
( ) A copy of this notice was placed in the bin located at this office
and identified as the location for the above law firm's collection of
file stamped documents.

Date of Mailing: 11/27/18
I declare under penalty of perjury that the foregoing is true and
correct. Executed on 11/27/18 at San Bernardino, CA

                            BY: LEANNE LANDEROS

# EXHIBIT B

COPY

1   SPENCER P. HUGRET (SBN: 240424)
    shugret@grsm.com
2   TIMOTHY A. HANNA (SBN: 310620)
    thanna@grsm.com
3   GORDON REES SCULLY MANSUKHANI, LLP
    Embarcadero Center West
4   275 Battery Street, Suite 2000
    San Francisco, CA 94111
5   Telephone: (415) 986-5900
    Facsimile: (415) 986-8054
6
    Attorneys for Defendant
7   FORD MOTOR COMPANY

8                    SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       FOR THE COUNTY OF SAN BERNARDINO

10

11

12  JACQUES POWERS on behalf of the BIG        )   Case No. CIVDS1830756
    ISLAND CLIMBERS ON THE MAINLAND            )   Unlimited Jurisdiction
13  INC. and ANGEL POWERS on behalf of BIG     )
    ISLAND CLIMBERS ON THE MAINLAND,           )   **DEFENDANT FORD MOTOR**
14  INC.,                                      )   **COMPANY'S ANSWER TO**
                                               )   **PLAINTIFFS JACQUES POWERS ON**
15                 Plaintiffs,                 )   **BEHALF OF BIG ISLAND CLIMBERS**
                                               )   **ON THE MAINLAND, INC. AND**
16          vs.                                )   **ANGEL POWERS ON BEHALF OF**
                                               )   **BIG ISLAND CLIMBERS ON THE**
17  FORD MOTOR COMPANY, a Delaware             )   **MAINLAND, INC.'S COMPLAINT**
    Corporation; SUNRISE FORD, a California    )
18  Corporation; and DOES 1 through 10, inclusive, )
                                               )   Complaint Filed: November 27, 2018
19                 Defendants.                 )

20

21

22

23

24

25

26

27
                                          1
28  ────────────────────────────────────────────────────────────
    DEFENDANT FORD MOTOR COMPANY'S ANSWER TO PLAINTIFFS JACQUES
    POWERS ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC. AND
    JANICE MCMILLAN ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND,
    INC.'S COMPLAINT

*(left margin vertical text)* Gordon Rees Scully Mansukhani, LLP  275 Battery Street, Suite 2000  San Francisco, CA 94111

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF SAN BERNARDINO
SAN BERNARDINO DISTRICT

DEC 27 2018

BY _____
LEANNE M. LANDEROS, DEPUTY

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1    Defendant FORD MOTOR COMPANY ("Ford"), for itself alone and for no other

2 parties, hereby answers Plaintiffs JACQUES POWERS on behalf of BIG ISLAND CLIMBERS

3 OF THE MAINLAND and ANGEL POWERS on behalf of BIG ISLAND CLIMBERS ON

4 THE MAINLAND, INC.'s ("Plaintiffs'") Complaint as follows:

5    Under the provisions of section 431.30(d) of the Code of Civil Procedure, Ford denies

6 each and every allegation, both specifically and generally, of each cause of action contained in

7 Plaintiffs' Complaint on file herein and the whole thereof, and denies that Plaintiffs were

8 damaged in any sum or sums, or at all.

9    Further answering the Complaint, and the whole thereof, including each and every

10 cause of action contained therein, Ford denies that Plaintiffs have or will sustain any injury,

11 damage or loss, if any, by reason of any act or omission, fault or negligence on the part of

12 Ford, its agents, servants and employees, or any of them.

13 **SEPARATE AFFIRMATIVE DEFENSES**

14    For further and separate answer to the Complaint and by way of affirmative defense,

15 Ford alleges as follows:

16 **FIRST AFFIRMATIVE DEFENSE**

17 **(Failure to State Cause of Action)**

18    1.    Plaintiffs' Complaint, and each and every cause of action alleged therein, fails to

19 state facts sufficient to constitute a cause of action against Ford and Ford denies that Plaintiffs

20 were damaged in any sum or sums, or at all.

21 **SECOND AFFIRMATIVE DEFENSE**

22 **(Statute of Limitations)**

23    2.    Ford is informed and believes, and on that basis alleges, that some or all of

24 Plaintiffs' claims may be barred by the statute of limitations including, but not limited to,

25 limitations contained within Code of Civil Procedure sections 335.1, 337, 338, 338.1, and 340;

26 Civil Code sections 1783 and 1791.1; and/or Commercial Code section 2725.

27 //

28

2

DEFENDANT FORD MOTOR COMPANY'S ANSWER TO PLAINTIFFS JACQUES
POWERS ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC. AND
JANICE MCMILLAN ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND,
INC.'S COMPLAINT

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

**THIRD AFFIRMATIVE DEFENSE**

**(Estoppel)**

3.     Plaintiffs are estopped from obtaining the relief sought, or pursing any of the claims raised or causes of actions contained in the Complaint, by virtue of their acts, failures to act, conduct, representations, admissions, and the like.

**FOURTH AFFIRMATIVE DEFENSE**

**(Waiver)**

4.     Plaintiffs have waived their rights to the claims, causes of action and relief sought in this Complaint against Ford, by virtue of their acts, failures to act, conduct, representations, admissions, and the like.

**FIFTH AFFIRMATIVE DEFENSE**

**(Laches)**

5.     Plaintiffs have unreasonably delayed the commencement of this action to the prejudice of Ford.  Therefore, the Complaint, and each and every cause of action alleged therein is barred, in whole or in part, by the doctrine of laches.

**SIXTH AFFIRMATIVE DEFENSE**

**(Economic Loss Rule)**

6.     Plaintiffs' causes of action have not accrued because Plaintiffs cannot establish that they suffered injury directly from the subject vehicle or products, and therefore Plaintiffs' contention that the subject vehicle or products failed to adequately perform their functions are barred by the economic loss rule.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Vehicle Fit for Intended Purpose)**

7.     Ford is informed and believes, and on that basis alleges, that the subject vehicle was fit for providing transportation at all relevant times hereto.  Accordingly, Plaintiffs are not entitled to relief for breach of the implied warranty of merchantability.  *American Suzuki Motor Corporation v. Superior Court* (1995) 37 Cal.App.4th 1291.

3

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

## EIGHTH AFFIRMATIVE DEFENSE

### (Duration of Implied Warranty)

8.     Ford is informed and believes, and on that basis alleges, that some or all of the alleged defects did not arise until more than three months had elapsed since the subject vehicle was sold to Plaintiffs.  Accordingly, Plaintiffs are not entitled to relief for such concerns under the breach of the implied warranty of merchantability.  Civil Code section 1795.5.

## NINTH AFFIRMATIVE DEFENSE

### (Lack of Maintenance and Other Exclusions)

9.     Ford is informed and believes, and on that basis alleges, that Plaintiffs and/or others may have improperly cared for and maintained the subject vehicle, and that some of Plaintiffs' concerns may have been proximately caused by such lack of maintenance of the subject vehicle or products.  Ford reserves the right to identify additional exclusions which may be applicable.

## TENTH AFFIRMATIVE DEFENSE

### (Unreasonable or Unauthorized Use of Vehicle)

10.     Ford is informed and believes, and on that basis alleges, that some of Plaintiffs' concerns may be barred by Plaintiffs' unreasonable or unauthorized use of the vehicle.  Civil Code section 1794.3.

## ELEVENTH AFFIRMATIVE DEFENSE

### (No Timely Revocation of Acceptance)

11.     Plaintiffs have no restitution remedy under breach of implied warranty because there was no timely revocation of acceptance before a substantial change in the condition of the goods.

## TWELFTH AFFIRMATIVE DEFENSE

### (No Reasonable Number of Attempts to Repair Afforded)

12.     The Complaint and, each and every cause of action therein, does not state facts sufficient to meet the statutory presumption of a reasonable number of repair attempts under

4

DEFENDANT FORD MOTOR COMPANY'S ANSWER TO PLAINTIFFS JACQUES POWERS ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC. AND JANICE MCMILLAN ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC.'S COMPLAINT

1  the terms of the Civil Code section 1793.22(b).

2  ## THIRTEENTH AFFIRMATIVE DEFENSE

3  ### (Preemption)

4  13.    The Complaint and, each and every cause of action therein, in whole, or in part,

5  are preempted by the Federal National Traffic and Motor Vehicle Safety Act pursuant to 49

6  U.S.C. sections 30118, *et seq.*

7  ## FOURTEENTH AFFIRMATIVE DEFENSE

8  ### (Performance)

9  14.    Prior to the commencement of this action, Ford fully performed, satisfied and

10  discharged all duties and obligations it may have owed to Plaintiffs arising out of any and all

11  agreements, representations or contracts made by it or on its behalf and this action is therefore

12  barred by the provisions of Civil Code section 1473.

13  ## FIFTEENTH AFFIRMATIVE DEFENSE

14  ### (Failure to Abide by Terms of Warranty)

15  15.    Claims by Plaintiffs of breach of warranty are barred because of Plaintiffs'

16  failure to give timely and appropriate notice of any claim of breach of warranty.

17  ## SIXTEENTH AFFIRMATIVE DEFENSE

18  ### (Failure to Use Third-Party Dispute Resolution)

19  16.    Ford makes available a qualified third-party dispute resolution process, and

20  therefore, it is entitled to relief under certain provisions of the Song-Beverly Consumer

21  Warranty Act.

22  ## SEVENTEENTH AFFIRMATIVE DEFENSE

23  ### (Accord and Satisfaction)

24  17.    Plaintiffs are barred from recovery, in whole or in part, on the ground that they

25  are subject to the defense of accord and satisfaction.

26  ## EIGHTEENTH AFFIRMATIVE DEFENSE

27  ### (Good Faith Evaluation)

28

*Left margin:* **Gordon Rees Scully Mansukhani, LLP**
275 Battery Street, Suite 2000
San Francisco, CA 94111

DEFENDANT FORD MOTOR COMPANY'S ANSWER TO PLAINTIFFS JACQUES POWERS ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC. AND JANICE MCMILLAN ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC.'S COMPLAINT

18.     At all times, Ford's evaluation of Plaintiffs' repurchase request has been in good faith, consequently, Plaintiffs have no claim for civil penalty for any alleged willful violation.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Doctrine of Equitable Abstention)

19.     Plaintiffs' claims for injunctive relief are barred by the doctrine of equitable abstention.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Failure to Notify)

20.     Ford is informed and believes, and on that basis alleges, that Plaintiffs failed to provide timely notice, within a reasonable period of time after discovery of their claims and alleged defects.  As a result, Ford has been damaged and prejudiced.  Therefore, the Complaint and each cause of action therein, are barred as a matter of law.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Complete Performance)

21.     Ford has appropriately, completely and fully performed and discharged any and all obligations and legal duties arising out of the matters alleged in the Complaint.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Compliance with Laws)

22.     Ford has complied with all laws and regulations with regard to the subject matter of Plaintiffs' Complaint, and is therefore not liable to Plaintiffs for any damages they may have sustained, if any.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Good Faith)

23.     At all times relevant and material to this action, Ford acted reasonably and in good faith.

//

//

6

DEFENDANT FORD MOTOR COMPANY'S ANSWER TO PLAINTIFFS JACQUES POWERS ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC. AND JANICE MCMILLAN ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC.'S COMPLAINT

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

**Gordon Rees Scully Mansukhani, LLP**
275 Battery Street, Suite 2000
San Francisco, CA 94111

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Independent Causes)

24.     The alleged injuries, damages or loss, if any, for which Plaintiffs seek recovery, were the result of causes independent of any purported acts or omissions on the part of Ford, or any of its agents, representatives or employees, thereby eliminating or reducing the alleged liability of Ford.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

### (Failure to Inspect)

25.     Ford alleges that Plaintiffs damages, if any, may have been caused by the failure of third parties, unrelated to Ford, to properly inspect the subject vehicle or products, thereby eliminating or reducing the alleged liability of Ford.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

### (Failure to Maintain)

26.     Ford alleges that any and all conditions in the subject vehicle or products described in the Complaint, if any there were, were solely a result of the failure to properly maintain and service the subject vehicle or products, thereby eliminating or reducing the alleged liability of Ford.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

### (No Breach)

27.     Ford alleges that it did not breach any duties to Plaintiffs, thereby barring and/or precluding Plaintiffs from recovery.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

### (No Affirmative Conduct)

28.     Ford alleges that there was no affirmative conduct on the part of Ford, which allegedly caused or contributed to Plaintiffs' alleged injuries and therefore Plaintiffs have no cause of action against Ford.

7

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

### TWENTY-NINTH AFFIRMATIVE DEFENSE

#### (No Substantial Factor)

29.     Ford alleges that the negligence and other legal fault alleged in the Complaint as against Ford, if any, was not a substantial factor in bringing about Plaintiffs' alleged injuries and, therefore, was not a contributing cause.

### THIRTIETH AFFIRMATIVE DEFENSE

#### (Excessive/Speculative Damages)

30.     Ford alleges that the damages allegedly sustained by Plaintiffs, if any, were excessive, exaggerated, unreasonable, speculative, inflated or otherwise unnecessary and/or unrelated to the alleged incident.

### THIRTY-FIRST AFFIRMATIVE DEFENSE

#### (Failure to Mitigate)

31.     If Plaintiffs have suffered any loss, damage or injury, it was directly or proximately caused by and is the result of Plaintiff's conduct and/or their potential failure to mitigate any such loss, damage or injury.

### THIRTY-SECOND AFFIRMATIVE DEFENSE

#### (Disclaimer of Incidental and Consequential Damages)

32.     Ford is informed and believes, and on that basis alleges, that by the terms of the limited warranty for the subject vehicle at issue, Ford is not liable for incidental or consequential damages.

### THIRTY-THIRD AFFIRMATIVE DEFENSE

#### (No Civil Penalty)

33.     Ford is informed and believes, and on that basis alleges, that Plaintiffs are barred from the recovery of a civil penalty by reason of Plaintiffs' failure to serve written notice pursuant to Civil Code section 1794(e)(3).

//

//

DEFENDANT FORD MOTOR COMPANY'S ANSWER TO PLAINTIFFS JACQUES POWERS ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC. AND JANICE MCMILLAN ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC.'S COMPLAINT

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

### THIRTY-FOURTH AFFIRMATIVE DEFENSE

#### (Constitutionality of Punitive Damages)

34.     The claims of Plaintiffs are in contravention of Ford's rights under applicable clauses of the United States and California Constitutions, including without limitation the following provisions:  (a) said claims constitute an impermissible burden on interstate commerce in contravention of Article I, Section 8 of the United States Constitution; (b) said claims contravene the Excessive Fines Clause of the Eighth Amendment of the United States Constitution; (c) said claims violate Ford's right to Due Process under the Fourteenth Amendment of the United States Constitution; (d) said claims contravene the constitutional prohibition against vague and overbroad laws; and (e) said claims contravene the Due Process Clause of the California Constitution.

### THIRTY-FIFTH AFFIRMATIVE DEFENSE

#### (Punitive Damages Improperly Pled/Not Recoverable)

35.     Ford is informed and believes, and on that basis alleges, that Plaintiffs have not properly pled a claim for punitive damages and these damages are not recoverable based on the facts contained in Plaintiffs' Complaint, or are otherwise barred by the provisions of Civil Code sections 3294, 3295, and 3296, or such conduct was adopted, ratified or authorized by Ford under Civil Code section 3294(b).

### THIRTY-SIXTH AFFIRMATIVE DEFENSE

#### (Punitive Damages Impermissible For Extra-Territorial Conduct)

36.     Any award of punitive damages based on anything other than Ford's conduct in connection with the design, manufacture, and sale of the subject vehicle or products that are the subject of this lawsuit would violate the due process clause of the Fourteenth Amendment to the United States Constitution because any other judgment for punitive damages in this case cannot protect Ford against impermissible multiple punishment for the same wrong and against punishment for extra-territorial conduct.

DEFENDANT FORD MOTOR COMPANY'S ANSWER TO PLAINTIFFS JACQUES POWERS ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC. AND JANICE MCMILLAN ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC.'S COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Gordon Rees Scully Mansukhani, LLP**
275 Battery Street, Suite 2000
San Francisco, CA 94111

## <u>THIRTY-SEVENTH AFFIRMATIVE DEFENSE</u>

### **(Punitive Damages Unconstitutional)**

37.     Ford is informed and believes, and on that basis alleges, that an award of punitive or exemplary damages to Plaintiffs would violate Ford's constitutional rights under the provisions of the United States and California Constitutions, including but not limited to the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 7 of the California Constitution because, among other things, (1) any award of punitive or exemplary damages would be grossly out of proportion to the alleged wrongful conduct and purported injury at issue here; (2) there is no legitimate state interest in punishing the alleged wrongful conduct at issue here, or in deterring its possible repetition; (3) the alleged wrongful conduct at issue here is lawful in other jurisdictions; (4) the alleged wrongful conduct at issue here is not sufficiently reprehensible to warrant the imposition of any punitive or exemplary damages; and (5) the criteria for the imposition of punitive or exemplary damage are unconstitutionally vague and uncertain and fail to provide fair notice of what conduct will result in the imposition of such damages.

## <u>THIRTY-EIGHTH AFFIRMATIVE DEFENSE</u>

### **(Punitive Damages -- If Any -- Must Be Limited)**

38.     Ford specifically incorporates by reference, as if fully set forth herein, any and all standards or limitations regarding the determination and enforceability of punitive damages awards as set forth in *State Farm Mutual Automobile Insurance Company v. Campbell* (2003) 123 S.Ct. 1513, and *BMW of North America v. Gore* (1996) 116 S. Ct. 1589.

## <u>THIRTY-NINTH AFFIRMATIVE DEFENSE</u>

### **(Set Off)**

39.     Ford alleges that if it is established that Ford is in any manner legally responsible for any of the damages claimed by Plaintiffs, which is denied, Ford is entitled to a set off of these damages, if any, that resulted from the wrongful acts of Plaintiffs and/or others.

DEFENDANT FORD MOTOR COMPANY'S ANSWER TO PLAINTIFFS JACQUES POWERS ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC. AND JANICE MCMILLAN ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC.'S COMPLAINT

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FORTIETH AFFIRMATIVE DEFENSE

### (Spoliation of Evidence)

40.     The subject vehicle or products identified in the Complaint that were allegedly designed, manufactured and distributed by Ford are missing, have been modified or altered and/or are no longer available for Ford's inspection, which impacts Ford's defense in this case.  Ford is therefore entitled to relief from this spoliation, including appropriate jury instructions, admonitions and any other relief afforded by the Court.

## FORTY-FIRST AFFIRMATIVE DEFENSE

### (Fees and Costs)

41.     Ford is informed and believes, and on that basis alleges, that the Complaint was brought without reasonable cause and without a good faith belief that there was a justifiable controversy under the facts or the law which warranted the filing of the Complaint against Ford.  Plaintiffs should therefore be responsible for all of Ford's necessary and reasonable attorney's fees and defense costs as permitted by California law.

## FORTY-SECOND AFFIRMATIVE DEFENSE

### (Additional Affirmative Defenses)

42.     Ford reserves its rights to raise and plead additional defenses and/or affirmative defenses which might become known during the course of discovery, as well as to dismiss any defenses which, as a result of discovery, are determined to be unsupported by good faith reliance upon either the facts or the law, or a non-frivolous argument for the extension, modification, or reversal of existing law or the establishment of new law.

//

//

//

//

//

//

11

DEFENDANT FORD MOTOR COMPANY'S ANSWER TO PLAINTIFFS JACQUES POWERS ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC. AND JANICE MCMILLAN ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC.'S COMPLAINT

**PRAYER**

WHEREFORE, Ford prays for the following relief:

1.      That Plaintiffs take nothing by reason of their Complaint, and that this action be dismissed in its entirety with prejudice;

2.      That judgment be entered in favor of Ford, on all causes of action;

3.      That Ford recover its costs of suit incurred herein as well as attorneys' fees to the extent permitted by law; and,

4.      That Ford be awarded such other and further relief as the Court may deem just and proper.


Dated:  December 27, 2018                    GORDON REES SCULLY MANSUKHANI LLP


                                             By: _____
                                                  Spencer P. Hugret
                                                  Timothy A. Hanna
                                                  Attorneys for Defendant
                                                  FORD MOTOR COMPANY

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

12

DEFENDANT FORD MOTOR COMPANY'S ANSWER TO PLAINTIFFS JACQUES POWERS ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC. AND JANICE MCMILLAN ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC.'S COMPLAINT

**PROOF OF SERVICE**

*Powers, Jacques on behalf of Big Island Climbers on the Mainland, Inc.., et al.  v. Ford Motor Company, et al.*

San Bernardino County Superior Court, Case No. CIVDS1830756

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is: Gordon Rees Scully Mansukhani, LLP 275 Battery Street, Suite 2000, San Francisco, CA  94111.  On the below-mentioned date, I served the within documents:

**DEFENDANT FORD MOTOR COMPANY'S ANSWER TO PLAINTIFFS JACQUES POWERS ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC. AND ANGEL POWERS ON BEHALF OF BIG ISLAND CLIMBERS ON THE MAINLAND, INC.'S COMPLAINT**

☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☐    by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☒    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in United States mail in the State of California at San Francisco, addressed as set forth below.

☐    by placing a true copy thereof enclosed in a sealed envelope, at a station designated for collection and processing of envelopes and packages for overnight delivery by FedEx as part of the ordinary business practices of Gordon & Rees LLP described below, addressed as follows:

Steve Mikhov
Knight Law Group
10250 Constellation Blvd., Suite 2500
Los Angeles, CA 90067
Tel.: (310) 552-2250
Fax: (310) 552-7973
*Attorney for Plaintiffs*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on December 27, 2018, at San Francisco, California.

_____
Christine Nusser

Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111